622 P.2d 23

**STATE of Arizona, Appellee,**

v.

**Robert H. FENDLER, Appellant.**

**Nos. 1 CA–CR 3376, 1 CA–CR 3748.**

Court of Appeals of Arizona, Division 1.

Sept. 11, 1980.

Rehearing Denied Dec. 11, 1980.

Review Denied Dec. 23, 1980.

468

Robert K. Corbin, Atty. Gen., by William J. Schafer, III, Chief Counsel, Criminal Division, Philip J. MacDonnell, Director, Sp. Prosecutions Division, Michael C. Cudahy, Asst. Atty. Gen., Samuel P. Goddard, III, Former Asst. Atty. Gen., Phoenix, for appellee.

Southern & Mulhall, by E. Reid Southern, Phoenix, and Thomas Horn, San Francisco, Cal., for appellant.

## OPINION

WREN, Vice Chief Judge.

On March 7, 1977, Robert H. Fendler (appellant), James R. Holman and Leonard H. Foreman were charged in a seventeen count indictment with criminal conduct in connection with the operation of several financial institutions headquartered in Phoenix, Arizona. The firms involved included the Lincoln and American Thrift Associations and the American Bank of Commerce. On October 13, 1977, co-defendant, Leonard Foreman, entered into a plea agreement with the state and plead guilty to the charge of conspiracy. (Count One). The trial subsequently commenced on October 17, 1977, and continued through

February 27, 1978, at which time the jury found appellant guilty of conspiracy, A.R.S. § 13–331 (now A.R.S. § 13–1003), false book entry, A.R.S. § 10–193 (now A.R.S. § 10–136), and failure to file a state corporate income tax return. A.R.S. § 43–179 (now A.R.S. § 43–842). On April 14, 1978, the trial court dismissed the conspiracy count on the basis of duplicity and thereafter entered judgments of guilt on each of the remaining two counts. Appellant was sentenced to serve not less than one nor more than three years on the failure to file count, and not less than four nor more than five years on the false book entry count.

Appellant filed his notice of appeal from the entry of judgment on April 24, 1978 (1 CA–CR 3376). On June 13, 1978, appellant filed a motion to vacate judgment pursuant to Rule 24.2, Arizona Rules of Criminal Procedure, 17 A.R.S. The motion was denied on September 28, 1978. Appellant thereafter filed an untimely notice of appeal from the order denying his motion to vacate. (1 CA–CR 3748). However, this Court suspended the filing requirements and the appeals were subsequently consolidated.

Since the appellant raises a substantial number of issues in his two appeals, we have set forth the necessary facts in the discussion of each individual question.

## CHALLENGE TO THE GRAND JURY

■ Appellant contends that the state grand jury was not impaneled according to law because prospective grand jurors were excused from service by the state grand jury commissioner (Commissioner).[1] Appellant asserts that the Commissioner had no authority to unilaterally excuse prospective state grand jurors, or, in the alternative, if she (Commissioner) was vested with some discretionary authority, such discretion was abused under the facts of the present case. He further asserts that the indictment should have been dismissed because the excusals materially altered the composition of

the grand jury and eliminated its statewide character.

The impanelment of state grand juries is regulated by statute and the Arizona Rules of Criminal Procedure. A.R.S. § 21–421 *et seq.*, Rule 12, Arizona Rules of Criminal Procedure, 17 A.R.S. The selection and preparation of state grand jurors is specifically governed by Rule 12.22, Arizona Rules of Criminal Procedure, 17 A.R.S., which divides the process into three distinct steps.

The first step is governed by Rule 12.22(B) which is designed to establish the initial pool of prospective state grand jurors:

*Assistance. . . .* Upon direction of the Assignment Judge, the jury commissioners of the respective counties shall submit to the Assignment Judge, within such time as he may direct, a specified number of prospective State grand jurors selected at random from their qualified jury boxes, wheels or rosters (otherwise known as current jury lists). . . .

The next step is governed by Rule 12.22(C) which provides that:

The Assignment Judge shall cause a questionnaire to be sent to each prospective State grand juror. Following return of such questionnaires, the jury commissioner of the county in which the Assignment Judge is serving shall select at random from those responding prospective State grand jurors, *who are qualified and not excused*, a number of prospective State grand jurors sufficient for final selection of State grand jurors; and this number shall be summoned to appear before the assignment judge for such final selection. (emphasis supplied.)

Appellant argues that the Commissioner's only function pursuant to Rule 12.22(C) is to make a random selection from those prospective grand jurors who respond to the questionnaire, since the county jury commissioners have already completed the qual-

---

1. The jury commissioner from the county in which the "Assignment Judge" sits acts as the state grand jury commissioner for the purpose of assisting in the impanelment of the state grand jury. A.R.S. § 21–423(B), Rule 12.22(C), Arizona Rules of Criminal Procedure, 17 A.R.S.

ification and excusal process by the time the names are submitted to the "Assignment Judge." We do not agree.

Rule 12.22(B) does not authorize the county jury commissioners to screen prospective candidates for the *state* grand jury. Their sole function is to forward a specified number of randomly selected names from their "current jury lists." [2]

On the other hand, we believe that Rule 12.22(C) contemplates that the initial qualification and excusal of prospective *state* grand jurors is to be undertaken by the Commissioner.[3] Consequently, we hold that the Commissioner possessed the necessary authority to excuse those prospective grand jurors who in her opinion were incapable of serving without "undue hardship." [4]

■ The office of "jury commissioner" was established to assist the courts with the jury selection process and to insulate judges from having to consider every request for excusal. A.R.S. § 21–131, *See United States v. Flynn*, 216 F.2d 354 (2nd Cir. 1954). To achieve these objectives, the jury commissioners were given a broad measure of unilateral discretion in determining whether a prospective juror should be excused from service. A.R.S. § 21–315, *See United States v. Gurney*, 393 F.Supp. 688 (1974); *United States v. Coppola*, 296 F.Supp. 903 (1969).[5] While it is true, in the instant case, that the Commissioner was not provided with judicial guidelines regarding the grounds for excusal from *state* grand jury service, she was guided by the statutory standard of "undue hardship", and the local superior court guidelines concerning the various grounds upon which a person could be excused from county jury service.

While the record reflects that the Commissioner deviated from the county guidelines in particular instances, we find no abuse of discretion.

■ However, even if we determined that certain jurors were erroneously excused, appellant would be confronted by the rule that a conviction will not be reversed for error in the selection of the grand jury unless the defendant is able to show *actual*

2. The persons' names who appear on the "current jury lists" have already qualified and not been excused from *county* jury service. A.R.S. §§ 21–315, 21–321. We can find nothing explicit or implicit in the language of Rule 12.22(B) which authorizes the county jury commissioners to screen candidates for the *state* grand jury. Furthermore, we believe that the language in Rule 12.22(C) is dispositive of the issue.

3. Our conclusion rests upon the interrelationship of several factors. First, the use of new questionnaires is typical of the process used in Arizona to qualify and excuse persons from jury service. *See* A.R.S. § 21–314. Moreover, the requirement that the Commissioner randomly select a number sufficient for final selection from those responding prospective state grand jurors is expressly qualified by the phrase "who are qualified and not excused", which, we interpret, when read in conjunction with the questionnaire requirement, as authorizing the Commissioner to engage in the qualification and excusal process. We are also convinced that it is eminently more practical for the Commissioner to engage in these activities because he or she is charged with the responsibility of coordinating the selection process and will generally have a better perspective of the specific needs of a particular state grand jury.

4. A.R.S. § 21–202 provides: "The following persons shall, upon their timely application to the court, be excused from service as a juror: .. 2) Any person upon whom as a juror would, in the judgment of the court impose an *undue hardship*." (emphasis supplied) While the above statute refers to judicial excusals and Rule 12.22(C) makes no specific reference to the statutory standard of undue hardship, we believe that the standard is implicit in the Rule by virtue of Rule 12.22(A), A.R.S. § 21–422 and A.R.S. § 21–315.

5. We recognize that A.R.S. § 21–315 was enacted prior to the creation of the state grand jury and concerns the jury commissioner's discretionary authority to excuse persons from *county* jury service. However, A.R.S. § 21–422(A) provides that "the law applicable to county grand juries ... shall apply to the state grand juries except insofar as it is in conflict with the article." Since there is no language in A.R.S. § 21–422 *et seq.* or Rule 12, Arizona Rules of Criminal Procedure, regarding the extent of the Commissioner's discretionary authority, we hold that the Commissioner possesses the same degree as he or she would possess in determining whether a person should be excused from county jury service.

*prejudice.*[6] *State v. Webb,* 101 Ariz. 307, 419 P.2d 91 (1966). Appellant's only argument along these lines is that the Commissioner's action resulted in a geographically imbalanced panel comprised of 15 Maricopa County residents and one resident from Graham County. *See* A.R.S. § 21–423(A). This fact alone fails to even make out a prima facie showing of "actual prejudice" since a defendant is not entitled to be tried or investigated by any particular juror or jurors from separate geographical areas. *See State v. Webb.* "If the jurors who actually serve are impartial and fair, the fact that the other impartial jurors are erroneously excused is not reversible error."[7] *State v. Webb,* 101 Ariz. at 309, 419 P.2d at 93.

## TAX COUNT

Appellant next contends that his conviction for failure to file a 1974 state corporate income tax return on behalf of American Thrift Association (American Thrift) was improper and therefore must be reversed.

Appellant was convicted of violating A.R.S. § 43–179(f) (now A.R.S. § 43–842) which provides that:

Any person who, within the time required by or under the provisions of this title, willfully fails to file any return or to supply any information with intent to evade any tax imposed by this title, is punishable by imprisonment in the county jail not to exceed one year, or in the state prison not to exceed five years, or by fine of not more than five thousand dollars, or by both such fine and imprisonment, at the discretion of the court.[8]

■ Appellant initially claims that the indictment was defective because it failed to specify his corporate relationship with American Thrift and to set forth his duty to perform the act in respect of which the violation occurred.[9] The state responds by arguing that the issue was not raised in a timely manner and therefore is waived for purposes of appeal. Rules 13.5(c), 16.1(c), Arizona Rules of Criminal Procedure, 17 A.R.S. We agree. After reviewing the record, we find that the appellant failed to specifically raise the issue in accordance with the requirements of Rule 16.1(b),[10] which now precludes him from asserting the issue on appeal. Rules 13.5(c) and 16.-1(c); *State v. Puryear,* 121 Ariz. 359, 590 P.2d 475 (App.1979).

■ He next urges that the tax conviction must fall because American Thrift was not obligated to file a return for the taxable period ending December 31, 1974. The resolution of this issue revolves around the

---

6. While we realize that *State v. Webb* concerned excusals by the court, we hold that the doctrine of "actual prejudice" extends to excusals by a jury commissioner.

7. The appellant has made no attempt in this appeal to establish that the grand jurors who returned the indictment acted unfairly.

8. "Person" is defined as including "individuals, fiduciaries, partnerships, and corporations." A.R.S. § 43–101(h). (now A.R.S. § 43–104(20)).

"Corporation. 'Corporation' shall mean and include all corporations, joint stock companies, banks, insurance companies, business trusts or so-called 'Massachusetts trusts', investment companies, building and loan associations, and other associations whether incorporated or unincorporated." A.R.S. § 43–101(j). (now A.R.S. § 43–104(3)).

9. Count 12 of the indictment provides that:
"On or about the 15th day of April, 1975, in the County of Maricopa, State of Arizona, ROBERT H. FENDLER and JAMES R. HOLMAN did, within the time required by or under the provisions of Title 43 of the Arizona Revised Statutes, willfully fail to file a return or to supply information, to wit: an Arizona State Corporate Income Tax Return for AMERICAN THRIFT ASSOCIATION (an Arizona corporation) for the taxable year ended December 31, 1974; with intent to evade a tax imposed by Title 43 of the Arizona Revised Statutes, all in violation of Arizona Revised Statutes § 43–141 (as amended), § 43–179; § 13–138, § 13–139 and § 13–140."

10. Rule 16.1(b) provides:
"Making of Motions Before Trial. All motions specified in the omnibus hearing form shall be made at or before an omnibus hearing. Any other motion, defense, objection or request which is capable of determination without the trial of the general issue shall, whenever possible, be made at or before an omnibus hearing, but, in any event, no later than 20 days prior to the date set for trial. Lack of jurisdiction may be raised at any time."

construction of certain language found in A.R.S. § 43–141(b)(1) (now A.R.S. § 43–307) which provides that:

Every corporation *subject to the tax imposed by this article* shall make a return to the tax commission.... (emphasis supplied.)

Appellant asserts that the underscored language should be interpreted as meaning that a corporation's duty to file is dependent upon whether state taxes are actually due and owing. We do not agree.

While our appellate courts have never been called upon to interpret the language in question, the Department of Revenue, which is charged with the responsibility of prescribing rules and regulations for the enforcement of the act (A.R.S. § 43–175(c)) (now A.R.S. § 43–223), has construed the language to mean that "every corporation *not expressly exempt* from tax must make a return of income, regardless of the amount of its net income." A.C.C.R. R15–2–141(b)–1(a) (1954). (emphasis supplied.)[11] *Also see A.C.C.R. R15–2–141(b)–1(b) (1954).* While we are not bound by administrative interpretation, "where long continued and in cases of ambiguity we will acquiesce therein." *City of Mesa v. Killingsworth*, 96 Ariz. 290, 296, 394 P.2d 410, 414 (1964); *Also see Long v. Dick*, 87 Ariz. 25, 347 P.2d 581 (1959); 80 A.L.R.2d 949 (1961).[12]

Appellant's additional contention that American Thrift was relieved of its responsibility to file a return because it ceased to exist as the result of a tax free reorganization is also without merit. The regulations clearly state that if a corporation exists during any portion of a taxable year, it is "required to make a return for that fractional part of a year during which it was in existence." [13]   *Also see* A.C.C.R. R15–2–152(g)–c.

Appellant next contends that in order to sustain a conviction under A.R.S. § 43–179(f), (now A.R.S. § 43–842), the state needed to prove that: a) appellant had a duty to file American Thrift's 1974 corporate income tax return b) American Thrift's failure to file the return was the result of appellant's intentional conduct c) American Thrift incurred actual tax liability for the year 1974, and d) appellant acted with the intent to evade the payment of taxes actually due and owing. We are not in complete agreement.

■ In our opinion, in order to establish a violation of the above section, the state must prove beyond a reasonable doubt that the defendant: 1) was legally obligated to file the return 2) willfully failed to file the return, and 3) acted with the intent to evade the payment of state income tax.

■ As for the first element, there appears to be no dispute, and the record supports the conclusion that appellant, as general manager of American Thrift, was obligated to file a return on behalf of American Thrift. *See* A.R.S. § 43–141(b)(2). (now A.R.S. § 43–307).

In establishing the second element of the offense the state bore the burden of proving that appellant "willfully" failed to file American Thrift's 1974 state corporate income tax return. While our courts have never passed upon the meaning of the word "willfully" as used in the context of our tax statutes, the United States Supreme Court has interpreted the word as meaning an intentional violation of a known legal duty.

---

11. No claim has been made that American Thrift was exempt from taxation. *See* A.R.S. § 43–147 (Now A.R.S. § 43–1201). Moreover, we interpret the quoted language as requiring a corporation to file a return even if it shows a loss for the taxable period in question.

12. We also note that appellant has proffered no authority or reasoning which would justify a contrary conclusion.

13. A.C.C.R. R15–2–141(b)–1(b) (1954) states, in pertinent part:

"(b) *A corporation having an existence during any portion of a taxable year is required to make a return. If a corporation was not in existence throughout an annual accounting period (either calendar year or fiscal year), the corporation is required to make a return for that fractional part of a year during which it was in existence.*" (emphasis supplied.)

*United States v. Bishop,* 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973).[14]

█ As a consequence, the failure to file must be intentional and deliberate rather than due to negligence, carelessness, or good faith mistake. *United States v. Farris,* 517 F.2d 226 (7th Cir.), *cert. denied,* 423 U.S. 892, 96 S.Ct. 189, 46 L.Ed.2d 123 (1975). Thus, in order to convict, the jury must find that the defendant intentionally and deliberately failed to file the required return knowing that he was legally obliged to do so. *United States v. McCorkle,* 511 F.2d 482 (7th Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975).

Again we believe that the evidence was more than sufficient for the jury to conclude that appellant acted "willfully" in failing to file the American Thrift return.

█ A review of the record indicates that appellant admitted that he was an attorney and a tax specialist. This fact alone would permit the inference that appellant knew of his duty to file the return. *United States v. Cirillo,* 251 F.2d 638, 639 (3rd Cir. 1957), *cert. denied,* 356 U.S. 949, 78 S.Ct. 914, 2 L.Ed.2d 843 (1958); *Leet v. State,* 203 Md. 285, 100 A.2d 789 (App.1953). The evidence further discloses that he (appellant) had an intimate working knowledge of American Thrift's business affairs which is another factor implying knowledge of his duty to file. *Lumetta v. United States,* 362 F.2d 644 (8th Cir. 1966).

Finally, corporate returns were filed by American Thrift for the years 1970, 1971 and 1972, years in which no state tax was due and owing, each of which were signed by appellant in his capacity as general manager. These previous filings are also indicative of appellant's awareness of his obligation to file, despite the fact that no taxes were due. *United States v. McCabe,* 416

F.2d 957 (7th Cir. 1969), *cert. denied,* 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1970); *United States v. Garguilo,* 554 F.2d 59 (2nd Cir. 1977); *United States v. Lumetta.*

The final element the state had to prove was that the appellant acted with an *intent to evade* the payment of state income taxes. It is here that appellant purportedly finds support for his claim that the trial court erred when it ruled that the state did not have to prove that appellant acted with an intent to evade the payment of state income taxes *actually due and owing.* However, appellant's entire argument rests upon the assumption that the phrase "intent to evade" found in A.R.S. § 43–179(f) (now A.R.S. § 43–842) is the functional equivalent of the phrase "attempt to evade" found in 26 U.S.C. § 7201, the federal tax evasion statute, which has been construed as requiring proof that a tax is due. *United States v. Garber,* 607 F.2d 92 (5th Cir. 1979).

█ The cardinal rule of statutory construction is to give effect to the legislature's intent. *State ex rel. Flournoy v. Mangum,* 113 Ariz. 151, 548 P.2d 1148 (1976). In ascertaining that intent, we look to the words, context, subject matter, effects and consequences, reason and the spirit of the law. *State ex rel. Flournoy v. Mangum; State v. Schoner,* 121 Ariz. 528, 591 P.2d 1305 (App.1979). Furthermore, the words of the statute should be given their plain and ordinary meaning, unless it appears from the context that a different meaning should control. *State v. Schoner; State v. Arthur,* 125 Ariz. 153, 608 P.2d 90 (1980). While we acknowledge that A.R.S. § 43–179(f) (now A.R.S. § 43–842) is a hybrid version of several different federal tax statutes, *see* 26 U.S.C. §§ 7203, 7207, the

---

14. A.R.S. § 1–215(36) provides that:

"In the statutes and laws of this state, unless the context otherwise requires:

'Wilfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or injure another or to acquire any advantage."

However, since our tax statutes are basically adopted from federal law, we will give great weight to the interpretations given similar statutes by federal authorities. Because we believe that the context requires otherwise we hold that the statutory definition is inapplicable in the present case.

thrust of the offense concerns a willful failure to file a return rather than an attempt to evade the payment of taxes actually due and owing. As a result, we believe that the most sensible construction would be to find that the intent element is satisfied upon a showing that the defendant acted with the requisite intent at the time of the alleged violation, regardless of whether taxes were actually due. A review of evidence leads us to believe that the state sufficiently met its burden.

Appellant next argues that the trial court erred when it precluded his expert witnesses from controverting material matters testified to by the state's expert witnesses.

The state was permitted, in its case-in-chief, to produce several expert witnesses who testified that American Thrift had not been involved in a tax-free reorganization in 1974.[15] As a consequence, they concluded that American Thrift had incurred substantial tax liability, as the result of the sale of its assets to Lincoln Thrift.[16] One of the state's experts also testified to the effect that even if American Thrift had merged with the American Bank of Commerce, that it (American Thrift) still would have been responsible for filing a return for that part of the taxable year during which it was in existence.[17] However, when appellant attempted in his case-in-chief, to rebut the evidence with his own expert testimony, the trial court sustained the state's objection ruling that it would not allow the witnesses to lecture the jury on the law of the case.[18]

The court further denied appellant's subsequent motion to strike.[19] While the admission of expert testimony falls largely within the sound discretion of the trial court, *State v. Dickey*, 125 Ariz. 163, 608 P.2d 302 (1980); *State v. Fierro*, 124 Ariz. 182, 603 P.2d 74 (1979), if the state endeavors to establish criminal liability by way of expert testimony then the defense is entitled, as a matter of fundamental fairness, to use its own expert testimony. *United States v. Caserta*, 199 F.2d 905 (3rd Cir. 1952), 35 Am.Jur.2d, Federal Tax Enforcement, § 151. Moreover, while we agree with the trial court's conclusion that it was improper for the defense witnesses to lecture the jury on the law of the case, the prospective testimony was clearly admissible for the limited purpose of lending credence to appellant's assertion that he never *intended* to evade the payment of taxes because his research led him to believe otherwise. The mere fact that appellant was allowed to testify concerning his reasons for failing to file American Thrift's return did not cure this error. Since appellant's conviction on the tax count (Count Twelve) must be reversed and remanded for a new trial, we do not believe that it is necessary to address the remaining issues raised by appellant in respect to that count.

## FALSE BOOK ENTRY

Appellant contends that the false book entry count (Count Three) was defective on

15. In essence, the state's experts testified that the sale of American Thrift's assets to Lincoln Thrift Association (Lincoln Thrift) and the subsequent purported merger of American Thrift into the American Bank of Commerce did not qualify as an integrated tax-free reorganization under 26 U.S.C. § 368(1)(A), (F).

16. No objection was made to the introduction of this testimony apparently because appellant believed that the state was attempting to meet its burden of proving that a tax was due and owing.

17. Again, no objection was tendered because appellant intended to rebut the conclusion with his own expert's testimony that American Thrift was not "subject to" state corporate income taxes in 1974.

18. Appellant's offer of proof indicated that his expert witnesses would testify that based upon their interpretation of statutes, revenue rulings and case law that 1) American Thrift had been involved in a tax-free reorganization under federal law and 2) American Thrift was not obligated to file a return as a result of the reorganization. In sustaining the state's objection, the trial court reasoned that the testimony concerned only questions of law, which fell within the special province of the court, and not the witnesses.

19. The gist of appellant's motion was that the court should strike all of the state's expert testimony relating to American Thrift's tax responsibilities for 1974, since the defense was precluded from rebutting it with its own expert witnesses.

the issue of appellant's intent to defraud. He asserts that "in the indictment an 'intent to defraud' also includes an intent to 'destroy', 'alter' and an 'intent to mulilate [sic] or falsify.'" But that under the terminology of the indictment there is no requirement that the acts of "making or concurring in the making of false entries or omissions" be done with *any* intent at all. The indictment thus makes the act of false book entry a crime of strict liability. He further alleges that he preserved the issue for purposes of appeal. We do not agree. We have reviewed the record and find that appellant did not raise this issue within the time provisions set forth in Rule 16.1(b), Arizona Rules of Criminal Procedure, 17 A.R.S. As a result, it is waived for purposes of appeal. Rules 13.5(c), 16.1(c), Arizona Rules of Criminal Procedure, 17 A.R.S.

Appellant further contends that the trial court's jury instruction on Count Three was also defective on the issue of appellant's intent to defraud.

█ The jury was instructed that they had to find beyond a reasonable doubt that the entries were made with an "intent to defraud." "Intent to defraud" was subsequently defined as an "intent to deceive *another person.*" (emphasis supplied.) Appellant contends that A.R.S. § 10–193(A)(2) (Repealed Laws 1975, Ch. 69 § 7, effective July 1, 1976) specifies that the "intent to defraud" must be directed toward the corporation itself, rather than just "another person."[20] We do not agree. There is nothing in the statute which indicates towards whom the "intent to defraud" must be directed. Moreover, appellant's construction does violence to the general aim of these statutes which is to insure that persons who inspect the books will receive a true and accurate description of the partic-

ular entity's condition. *United States v. Darby*, 289 U.S. 224, 53 S.Ct. 573, 77 L.Ed. 1137 (1933). Based upon the foregoing, we find no error.

█ Appellant next claims that the state failed to prove that the 74–1 journal entries were "false" within the meaning of A.R.S. § 10–193(A)(2).[21]

The evidence adduced at the trial established that Lincoln Thrift had adopted a double entry accounting system. In its most simplified form this meant that each entry into its general ledger was supported by an external document with a designated journal entry number. In essence, the external document acted as the source of original entry into the general ledger. In accordance with the appellant's instructions, Leonard Foreman prepared adjusting journal entry 74–1 to record the acquisition of American Thrift's offices and accounts. However, in order for the credit and debit entries to balance, and therefore show that Lincoln Thrift had received value for the acquisitions, appellant directed Foreman to capitalize certain expenses which were thereafter entered in the debit (asset) column of the entry. On June 30, 1974, the entries were posted in Lincoln Thrift's general ledger with the corresponding designation of 74–1.

Appellant initially argues that the state's expert witnesses only established that the entries in question were not in accordance with generally accepted accounting standards, not that the entries were "false".[22] We do not agree.

While much of the expert's testimony was couched in terms of generally accepted accounting principles, the entire tenor of their testimony was to the effect that certain of the entries had no basis in fact as well as in theory.

---

**20.** A.R.S. § 10–193(A)(2) provided that:
"A. It is unlawful for a director, officer or agent of a corporation or association to: ...
2. Defraud, destroy, alter, mutilate or falsify any books, papers, writings or securities belonging to such corporation or association, or make, or concur in making, any false entries or omit or concur in omitting to make any material entry, in a book of accounts or other record

or document kept by the corporation or association, with intent to defraud."

**21.** See footnote 20.

**22.** The state specifically alleged that the following intangible asset categories were "false": 1) goodwill 2) acquisitions and retention 3) branch offices 4) investment securities.

Appellant also directs our attention to the following colloquy between his counsel and Leonard Foreman, which he contends conclusively established that the entries were not "false" within the meaning of A.R.S. § 10–193(A)(2).

[By appellant's counsel]

Q. . . . After making the adjusting entries [74–1] to the books of Lincoln Thrift Association, did the Lincoln Thrift Association books reflect the total cost to Lincoln Thrift of the transactions with American Thrift?

A. Yes.

In support of this argument, he cites the cases of *State v. Heron*, 94 Ariz. 81, 381 P.2d 764 (1963) and *State v. Grow*, 93 Idaho 588, 468 P.2d 320 (1970). In *Heron*, with which this Court is particularly familiar, the indictment charged the defendant with having made a "false" deposit entry because "in truth or fact said [sum] was never deposited" 94 Ariz. at 85, 381 P.2d at 767. While the state conceded that the deposit had been actually made, it nevertheless contended that a true and correct entry made with a fraudulent intent constituted a "false" entry under the statute. (A.R.S. § 10–193(A)(2)). After an extensive review of the case law in the area, the Supreme Court rejected the state's position, reasoning that "a recital on the books which speaks the truth cannot be a 'false' entry." 94 Ariz. at 85, 381 P.2d at 767.[23]

In our opinion, *Heron* is factually distinguishable simply because the accuracy of certain 74–1 entries was at issue from the commencement of this case. In *United States v. Darby*, 289 U.S. at 225, 53 S.Ct. at 574, 77 L.Ed. at 1138, cited with approval in *Heron*, the United States Supreme Court observed that:

The crime of making false entries by an officer of a national bank with the intent to defraud . . . includes any entry on the books of the bank which is *intentionally made to represent what is not true or does not exist, . . .* (citation omitted) . . . . To read the statute otherwise is to be forgetful of its aim. Its aim was to give assurance that upon an inspection of a bank, public officers and others would discover in its books of account a picture of its true condition. (citations omitted.) (emphasis supplied.)

While the 74–1 entries, taken as a whole, may reflect appellant's personal analysis of the "costs"[24] involved in acquiring American Thrift's offices and accounts, the evidence overwhelmingly supports the jury's conclusion that certain of the entries represented assets which simply did not exist. Consequently, we find appellant's argument to be without merit.

Appellant further contends that the trial court erroneously stated that a "failure to comply with generally accepted accounting principles" was an element of the crime of "false book entry" under A.R.S. § 10–193(A)(2). In support of his claim appellant refers this Court to the Reporter's Transcript dated February 1, 1978, at page 45. The citation fails to support appellant's assertion.[25] We have also reviewed the jury instruction on Count Three and find that no mention was made of generally accepted accounting principles.

Appellant next contends that the trial court prevented him from developing a main theory of his defense by precluding him from testifying on various subjects which were allegedly related to his "intent" at the time he formulated the entries (74–1) in question.

■ We begin our analysis premised on the *fundamental principle* that the relevance and admissibility of offered evidence lies within the sound discretion of the trial court and such discretion will not be dis-

---

**23.** We have reviewed the *Grow* decision and find that we need not address it since it is factually distinguishable from the present case.

**24.** "Costs" meaning the debit (asset) and credit (liability) entries reflected in adjusting journal entry 74–1.

**25.** The statement we are referred to was made outside the presence of the jury in reference to an element of a different offense.

turbed on appeal absent a showing that it was clearly abused. *State v. Tulipane*, 122 Ariz. 557, 596 P.2d 695 (1979); *State v. Mosley*, 119 Ariz. 393, 581 P.2d 238 (1978).

In support of his claim of error on the issue of intent appellant first asserts that the trial court erroneously precluded him from testifying as to his "state of mind" leading up to the formation of the American Bank of Commerce because it was in fact relevant to the 74–1 entries. A review of the record discloses that during the argument following the state's objection to such testimony that appellant's counsel never once claimed that the evidence was relevant to the "false book entry" charge. Having failed to offer the evidence for the purpose suggested in this appeal, appellant cannot now predicate error based upon its exclusion. *Ross v. State*, 23 Ariz. 302, 203 P. 552 (1922).

Appellant next contends that he was precluded from testifying that he had relied upon legal research to support the journal entries (74–1). Again the record does not support appellant's claim, because he in fact testified on several occasions that he had done legal research and that each and every entry was supported by relevant tax law. We note that the trial court did prevent appellant from discussing the contents and holdings of particular cases on the basis that it was inappropriate for the witness to lecture the jury on the law of the case. We find no error.

Appellant further questions the trial court's ruling prohibiting him from testifying that he had relied on industry practices in formulating the accounting entries (74–1). The record discloses that appellant was asked if he had depended upon any other source of information to justify the journal entries. He (appellant) answered that he had relied on what other banks and saving and loan associations had done in the area. The state's relevancy objection was sustained. However, no motion to strike was tendered, consequently, even if the court erred, it was harmless since the answer remained in the record.[26] *Greene v. Hereford*, 12 Ariz. 85, 95 P. 105 (1908); *Ross v. State; State v. Abbey*, 13 Ariz.App. 55, 474 P.2d 62 (1970).

Appellant was also precluded from testifying about the actual accounting practices of other financial institutions and how his method of operation had purportedly conformed to what the others had done. He argues that industry "custom and usage" are relevant to a "state of mind" defense and therefore the testimony was erroneously excluded.[27] While we are not prepared to say that such evidence could never be probative of a person's intent, appellant's assignment must fail for lack of an adequate offer of proof. At no time did appellant proffer to the court what he intended to introduce by way of specific testimony or otherwise. His counsel's repeated references to "state of mind" failed to sufficiently place the trial court in a position of being able to determine whether the proposed evidence was in any way probative of appellant's "intent" at the time he formulated the entries. Absent such specification, appellant cannot claim error on appeal.

We have also reviewed appellant's complaints concerning other evidentiary rulings on the question of "intent" and find them unsupported by the record and therefore without merit.

Appellant next contends that the trial court erred in refusing to give an instruction on the defense of advice of counsel. While there appears to be no Arizona case

---

26. We have also reviewed the court's jury instruction on the subject of objections. The jury was informed that a witness will sometimes answer a question before an objection is interposed, if the court sustained the objection, that it would then have to rule on a motion to strike, and if it granted the motion, that it would inform them (jury) to disregard the answer. Since the jury was not so informed we find nothing in conflict with the above cited rule.

27. The case of *Lingenfelter v. Title Insurance Company of Minnesota*, 442 F.Supp. 981 (1977), cited by appellant in support of his position is clearly distinguishable not only on its facts but also on the law of the case.

law on the subject, the general rule is that in order to be entitled to such an instruction the defendant must introduce evidence which shows that: 1) he placed all the relevant facts known to him before his counsel 2) counsel rendered an opinion on the propriety of a *particular* course of action 3) he believed that the opinion was rendered in good faith, and 4) in reasonable reliance upon that opinion he engaged in a course of action which corresponded with his counsel's opinion. *United States v. Danser*, 26 F.R.D. 580, 587 (1959), *affirmed*, 281 F.2d 492 (1st Cir. 1960); *also see Bursten v. United States*, 395 F.2d 976 (5th Cir. 1968), *cert. denied*, 409 U.S. 843, 93 S.Ct. 44, 34 L.Ed.2d 83 (1972).

■ While it is a fundamental principle of law that a defendant is entitled to an instruction on a defensive theory for which there is any foundation in the evidence, *State v. Melendez*, 121 Ariz. 1, 588 P.2d 294 (1978); *State v. Gamble*, 111 Ariz. 25, 523 P.2d 53 (1974); there was no evidence presented at trial that appellant or anyone else ever consulted attorney David M. West or any other counsel concerning the propriety of the entries associated with adjusting journal entry 74–1. While Mr. West did testify that he advised appellant as early as 1972 that the Thrift companies were not required to use generally accepted accounting principles, "in maintaining their books and records or in preparing, [or] filing the reports required by law," on cross-examination, he admitted that he had not been consulted concerning the preparation of Lincoln Thrift financial statements nor had he reviewed the books and records before the financial statements were prepared prior to *October, 1975*. Absent any evidence that Fendler received advice of counsel concerning the 74–1 entries, the trial court acted properly in refusing to give the requested instruction.

■ Appellant further contends that his false book entry conviction must be reversed because the trial court's post-verdict dismissal of the conspiracy count (Count One) raised the distinct possibility that his conviction rested on an impermissible ground (i. e. the conspiracy count). *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). We do not agree.

The jury was given an extensive instruction on conspiracy. As noted earlier, the jury subsequently found appellant guilty of conspiracy (Count One), false book entry (Count Three) and failure to file a state corporate income tax return (Count Twelve).[28] Prior to entering judgment, the trial judge dismissed the conspiracy count because he had determined that it was fatally defective.[29] Appellant now argues that he must be granted a new trial because it is impossible to determine whether his conviction for false book entry rested on the false book entry instruction or on the following portion of the conspiracy instruction:

(d) The crime of conspiracy is a separate and distinct offense from the crime or crimes which may have been the object or objects of the conspiracy. A co-conspirator committing a crime pursuant to conspiracy is held to be the agent of other conspirators .... Even though he did not participate in the acts constituting the crime of false book entry, either Mr. Fendler or Mr. Holman could be found guilty of that offense if you are satisfied beyond a reasonable doubt:

1. That the essential elements of false book entry have been established,

2. False book entry was committed pursuant to a conspiracy.

3. Mr. Fendler or Mr. Holman was a member of the conspiracy at the time that false book entry was committed.

---

28. Holman was acquitted of the "false book entry" charge.

29. The trial court determined that Count One was bad for duplicity, in other words, it charged multiple offenses in a single count, which violated the requirement that separate offenses be set forth in separate counts. *See* Rule 13.3, Arizona Rules of Criminal Procedure, 17 A.R.S. The trial court's order has been appealed by the state. *See State v. Fendler,* 127 Ariz. 458, 622 P.2d 17 (1980).

It is inconceivable to this tribunal, based upon the record before us, that the jury could have predicated its verdict on the false book entry charge solely, if at all, upon the defective conspiracy count. Appellant never disputed the fact that he formulated the 74–1 entries and directed their placement on the Lincoln Thrift books. Rather, appellant tried to escape liability by attempting to establish the accuracy of the entries and his lack of intent to defraud. However, the evidence adduced at trial clearly permitted the jury to find to the contrary. In our opinion, there is no possible chance that the jury could have found that the "essential elements" of false book entry were established without also finding that appellant was the culpable party. We find no error.

### PROSECUTORIAL MISCONDUCT

Appellant next argues that the trial court erred by denying his motion to dismiss the indictment because of Leonard Foreman's alleged perjury before the state grand jury.

On February 8, 1977, Leonard Foreman testified before the state grand jury concerning appellant's alleged deletion of footnotes from the December 31, 1974 financial statement of Lincoln Thrift Association (Financial Statement) which was filed with the Arizona Corporation Commission (Commission) in April of 1975. The testimony, in pertinent part is as follows:

Q. After you prepared Exhibit No. 28, the statements of financial condition for Lincoln Thrift Association as of December 31, 1974, what did you do with it?
A. I gave it to Mr. Fendler.
Q. At the time that you gave the statement of financial condition, which is Exhibit No. 28, to Mr. Fendler, was Mr. Fendler fully aware that approximately $1,500,000 of fictitious assets were represented on that?
A. Yes, sir.

    *    *    *    *    *    *

Q. Mr. Foreman, I am now going to give you what has been marked Exhibit No. 29 and ask you if you recognize that?

A. Yes, sir.
Q. Would you tell the Grand Jury what that is, please?
A. Lincoln Thrift Association notes to the financial statements, December 31, 1974.
Q. Did you prepare the original of that document?
A. Yes sir, I did.
Q. Exhibit No. 29 is a photocopy. To the best of your knowledge, does it appear to you to be a true and correct copy of the original which you prepared?
A. Yes, sir.
Q. Were those notes an integral part of the 12–31–74 Lincoln Thrift financial statement; were they to be?
A. They were to be, yes, sir.
Q. Were they in fact part of the financial statement?
A. No, sir.
Q. Were they given to Mr. Fendler?
A. Yes, sir.
Q. Is there any reference in those notes to the financial statement about the fact that Lincoln Thrift Association's books have approximately 1.5 million dollars in fictitious assets?
A. Will you repeat that, please?
Q. Is there any notation that as to the 1.5 million dollars in assets that were placed on the books of Lincoln Thrift Association, June '74?
A. Yes, sir, they are categorized in various different documents.
Q. Was Mr. Fendler aware that the notes to the financial statement were to be an integral part of that?
A. Yes, sir.

    *    *    *    *    *    *

Q. Both [Fendler and Holman] were aware that the display of financial statement or balance sheet without the notes would misrepresent the financial condition of Lincoln Thrift Association?
A. Yes, sir.

This testimony, at least in part, was responsible for appellant's indictment in Counts Thirteen, Fourteen and Fifteen.

In the latter part of October, 1977, appellant's counsel discovered that Foreman had not prepared footnotes for the Financial Statement until after it had been filed with the Commission.[30]  Appellant's counsel also learned that the state was purportedly aware of this information prior to the indictment being handed down, but had nevertheless failed to inform the court, opposing counsel or the grand jury of the possible discrepancy in Foreman's testimony.  Upon the revelation of these facts, appellant promptly moved the court to dismiss the entire indictment (17 counts) on the basis of "prosecutorial misconduct." Appellant relies heavily on the case of *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974), in support of his position. In *Basurto*, a person names Barron, who was subsequently named in the indictment as a co-conspirator but not as a defendant, testified concerning appellant's activities in the conspiracy before the grand jury which brought the indictment. Prior to the commencement of trial, Barron informed the prosecuting attorney that he had committed perjury before the grand jury in material respects. After learning of the perjury, the prosecutor informed opposing counsel, but failed to notify either the court or the grand jury. The Court of Appeals held:

> that the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel—and, if the perjury may be material, also the grand jury—in order that appropriate action may be taken. 497 F.2d at 785, 786.

In our opinion, the factual posture of *Basurto* is clearly distinguishable from the facts of the present case.  Not only is there some real doubt as to whether Foreman actually perjured himself,[31] but appellant has also failed to sufficiently establish that the prosecution was *aware* of the perjury and that the alleged perjured testimony was *material* to the indictment on Counts Three and Twelve, which are the only counts before this Court in this appeal.  *See State v. Jacobson*, 22 Ariz.App. 128, 524 P.2d 962 (1974); *State v. Brewer*, 26 Ariz. App. 408, 549 P.2d 188 (1976).

■ Appellant also claims that the above information was exculpatory evidence which should have been presented to the grand jury by the prosecution.  While there is some doubt as to whether the information was in fact guilt negating, we need not address that issue because the Supreme Court recently observed in *State v. Baumann*, 125 Ariz. 404, 610 P.2d 38 (Supreme Court 1980) that:

> The contention that a grand jury must consider all exculpatory evidence misreads the grand jury's primary function of determining whether probable cause exists to believe that a crime has been committed and that the individual being investigated was the one who committed it.  (citations omitted) Any more would put grand juries in the business of holding minitrials.  (citations omitted) 610 P.2d at 42.

Moreover, the alleged exculpatory evidence applied only to Counts Thirteen, Fourteen and Fifteen of the indictment; consequently, it would have been error if the trial court had dismissed any of the other counts for the above cited reason.  *See State v. Jones*, 120 Ariz. 556, 587 P.2d 742 (1978).

**30.**  Apparently, Foreman decided not to prepare footnotes for the financial statement because they would have been identical to footnotes attached to another Lincoln Thrift financial statement which was filed in August of 1974.

**31.**  While we admit that Foreman's testimony was far from a model of clarity and probably was misleading, Foreman did in fact prepare footnotes for the Financial Statement subsequent to its filing with the Commission and purportedly furnished the completed work product to appellant.  Furthermore, the footnotes were an integral part of the Financial Statement for without them the Statement was misleading.

## DISCOVERY

■ Appellant contends that Rule 15.2(c), Arizona Rules of Criminal Procedure, 17 A.R.S., which requires a defendant to disclose the names and addresses of all persons whom he intends to call as witnesses at trial, is violative of his constitutional right against self-incrimination. U.S.Const. Amend. V. Arizona Const. art. 2 § 10. We do not agree. While our Supreme Court has upheld the validity of Rule 15.2, *Wright v. Superior Court*, 110 Ariz. 265, 517 P.2d 1261 (1974); *State v. Talley*, 112 Ariz. 268, 540 P.2d 1249 (1975), no Arizona appellate decision has specifically addressed this Fifth Amendment question. Nevertheless, we believe that the case of *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), is dispositive of the issue. In *Williams*, the United States Supreme Court held that the privilege against self-incrimination was not violated by a pretrial discovery provision which required a defendant to disclose the names and addresses of his alibi witnesses. While the court's holding was limited to the pretrial discovery of alibi witnesses, we believe that the logic and reasoning of that decision are just as applicable here.

Appellant's reliance on case law of sister jurisdictions, which have invalidated similar discovery provisions based on *state* constitutional self-incrimination grounds is neither controlling nor persuasive, *Prudhomme v. Superior Court of Los Angeles County*, 2 Cal.3d 320, 85 Cal.Rptr. 129, 466 P.2d 673 (1970); *Scott v. State*, 519 P.2d 774 (Alaska, 1974), since our Supreme Court has held that Article 2, § 10 of the Arizona Constitution does not afford a criminal defendant any greater protection than the Fifth Amendment of the United States Constitution. *State v. White*, 102 Ariz. 162, 426 P.2d 796 (1967).

Appellant further contends that the trial court's order precluding him from calling two specific witnesses for lack of compliance with Rule 15.2, Arizona Rules of Criminal Procedure, 17 A.R.S., violated his constitutional right to a fair trial. U.S.Const. Amends. VI, XIV.

On March 21, 1977, the state filed its initial disclosure pursuant to Rule 15.1, Arizona Rules of Criminal Procedure, 17 A.R.S. When appellant failed to make the required reciprocal disclosures pursuant to Rule 15.2, the state, on April 6, 1977, moved the trial court to compel disclosure. On July 6, 1977, the trial court ordered appellant to file his initial disclosure within fifteen days. Appellant failed to comply. On August 19, 1977, the trial court again ordered appellant to comply with Rule 15.2 or face the possibility of sanctions. Finally, on September 2, 1977, appellant filed his initial disclosure which contained, in part, the names of over one thousand prospective witnesses. The names of the two witnesses in question. Messrs. Schaffer and Pierson were listed, but their addresses were designated as unknown. On September 14, 1977, the state filed a motion complaining about the inadequacy of appellant's disclosure, because, among other deficiencies, the disclosure contained 131 names without addresses. The trial court agreed and ordered appellant to disclose the names and *addresses* of all witnesses he intended to call. Appellant responded by filing an extensive amended disclosure statement; however, the addresses of Schaffer and Pierson were once again omitted. On October 6, 1977, the state moved the trial court to preclude appellant from calling any witnesses whose name and address had not been disclosed.[32] The motion was granted. In spite of that order, appellant filed numerous supplemental disclosures containing the names and addresses of various prospective witnesses, however, no effort was made to supply the missing addresses of Schaffer and Pierson. On January 9, 1978, the defense presented its list of prospective witnesses. The state objected to certain names on the list, including Schaffer and Pierson, and moved the court to enforce its prior exclusionary

---

32. We note that appellant's amended disclosure still contained 106 names without accompanying addresses.

order. Several days later the trial court entertained extensive argument on the issue.[33] The defense contended that they were not put on notice of the relevance of Schaffer's testimony until the middle of the state's case when the state questioned, allegedly for the first time, the accuracy of the 74–1 entry entitled "investment securities". Appellant further argued that the state was aware of Schaffer's address as early as the convening of the state grand jury,[34] and therefore any surprise or prejudice was due to the state's own negligence in failing to schedule an interview. The prosecution countered by arguing that not only was Schaffer's testimony irrelevant, but permitting him to testify would prejudice the state's case because it had relied on the court's prior order. The trial court reaffirmed its prior position and precluded the defense from calling either witness based upon its determination that the defense had received adequate notice on the "investment security" issue so that no surprise was involved.

Rule 15.2(c) states:

c. Disclosures by Defendant. Simultaneously with the notice of defenses submitted under Rule 15.2(b), the defendant *shall* make available to the prosecutor for examination and reproduction:

(1) the names and addresses of all persons, other than the defendant himself, whom he will call as witnesses at trial, together with all statements made by them in connection with the particular case. (emphasis supplied)

Rule 15.7 further provides that:

a. If at any time during the course of the proceeding it is brought to the attention of the court that a party has failed to comply with any provisions of this rule

or any order issued pursuant thereto, the court may impose any sanction which it finds just under the circumstances, including, but not limited to:

.    .    .    .    .

(4) Precluding a party from calling a witness, offering evidence, or raising a defense not disclosed. . . .

▐   While the appropriate sanction for noncompliance lies within the sound discretion of the trial court, *State v. Smith*, 123 Ariz. 243, 599 P.2d 199 (1979); *State v. Clark*, 112 Ariz. 493, 543 P.2d 1122 (1975), the trial court "should seek to apply sanctions that affect the evidence at trial and the merits of the case as little as possible. . . ." *State v. Smith*, 123 Ariz. at 252, 599 P.2d at 208 (1975). Moreover, precluding a witness from testifying should only be invoked "in those cases where other less stringent sanctions are not applicable to effect the ends of justice."[35] *State v. Gutierrez*, 121 Ariz. 176, 181, 589 P.2d 50, 55 (App. 1978); *State v. Smith, State v. Fierro.*

▐   It is glaringly apparent from examining the record that appellant willfully failed to comply with Rule 15.2(c) and the numerous discovery orders of the trial court. Despite this fact, appellant would have us disregard his flagrant abuse of the rules based upon the state's purported awareness of the witnesses' location prior to trial and the alleged prejudice suffered by appellant as a result of the exclusionary order. While we admit that Schaffer's testimony might have been relevant, we are of the opinion that appellant's offer of proof was insufficient to fully inform the court of the relevancy, let alone the vitality, of the proposed testimony. While appellant's counsel made some very broad assertions

---

**33.** Appellant informed the court that Pierson would be called only if Schaffer was unavailable, but that Schaffer assured him he would testify. Consequently, the argument focused solely on Schaffer's testimony because of the cumulative nature of Pierson's testimony. As a result, our discussion and decision rests on the arguments relating to Schaffer.

**34.** It appears that both Schaffer's and Pierson's names were read to the state grand jury as

potential witnesses. However, their addresses were not disclosed.

**35.** While we are aware that *Smith* articulated specific standards for determining whether a witness should be precluded from testifying, in the absence of a specific ruling requiring retroactive application, we do not believe that it is appropriate to apply that specific standard to the instant case.

regarding the prospective content of Schaffer's testimony, counsel became extremely evasive when the court and opposing counsel attempted to inquire as to specifics. It is also apparent that the defense sensed the need to offer Schaffer himself to effectively clear the air concerning his testimony, since they insisted on securing Schaffer's attendance to make an offer of proof, an event, we note, which never occurred. Another factor of some import in our decision concerns the tardiness of appellant's claim. If Schaffer's testimony was so vital to the "investment security" issue, then why did the defense wait for almost two months after they discovered that it was an issue to inform the trial court or opposing counsel that they needed relief from the trial court's prior order concerning the preclusion of witnesses without addresses.[36] To wait until the presentation of their own case to indicate that they actually intended to call Schaffer might well have prejudiced the state's case.

Based upon the foregoing, we find neither justification for appellant's conduct nor prejudice to his defense. Consequently, the trial court acted properly in precluding the witnesses' testimony.

However, even assuming, arguendo, that the trial court erred in precluding the testimony, the evidence on the other entries was of such an overwhelming nature that we believe any error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### CONSPIRACY COUNT

▪ Appellant next contends that the trial court committed "fundamental" error when it allowed the state to introduce evidence pertaining to the conspiracy count (Count One).

The facts are as follows: On September 30, 1977, appellant filed a pretrial motion to dismiss Count One on the basis of duplicity. The motion was denied. Thereafter, the trial commenced and the state introduced evidence bearing on the conspiracy charge. While the jury subsequently found appellant guilty of several charges, including conspiracy, the trial court reversed its prior position and dismissed Count One on the basis that it was duplicitous.

Appellant now claims that he was denied due process and a fair trial because the trial court's failure to dismiss Count One prior to trial resulted in the introduction of highly prejudicial evidence which would have otherwise been inadmissible.

Appellant prefaces his argument by conceding that the vast majority of the evidence in question was admitted without objection.[37] He also acknowledges that he is unable, except in two instances, which will be subsequently discussed, to point to any evidence which would have been inadmissible if the pretrial motion had been granted. Nevertheless, appellant proposes that we should *presume* that he was prejudiced to the extent that it constituted "fundamental" error because the jury *may* have been influenced by evidence relating to a defectively pleaded count.[38] In our opinion, we see no justifiable reason for setting aside appellant's convictions based upon his mere conjecture that he may have been somehow prejudiced. We have reviewed the evidence pertaining to the substantive counts in question and find that it amply supports the jury's verdicts. Consequently, even if the evidence relating to the conspiracy was erroneously admitted, we believe that such error was harmless beyond a reasonable doubt. *Chapman v. California.*

---

**36.** Through their argument to the trial court, the defense acknowledged their awareness of the issue no later than November 21, 1977.

**37.** As a result, appellant attempts to avoid the waiver of such issue by characterizing the error as "fundamental". *See* Rule 19.3 Arizona Rules of Criminal Procedure, 17 A.R.S. We also note that the objections that were actually made generally pertained to the relevancy of the evidence as it pertained to the conspiracy count.

**38.** Whether Count One was actually duplicitous is the subject of an appeal by the state in *State v. Fendler,* 127 Ariz.App. 458, 622 P.2d 17 (1980).

In conjunction with his general attack on the admission of evidence relating to Count One, appellant additionally claims that the trial court committed "fundamental" error when it allowed Leonard Foreman (co-defendant) to testify that he plead guilty to one of the offenses (conspiracy) with which appellant was charged without subsequently instructing the jury that such plea was not to be considered as substantive evidence of appellant's guilt.

Leonard Foreman's guilty plea first came to light, or its existence was at least implied, during defense counsel's opening statement to the jury when he suggested that Foreman's forthcoming testimony should be viewed with a jaundiced eye in light of his plea bargain agreement with the state which required him to "testify good." [39]

Anticipating the defense's attack on Foreman's credibility, the state, on direct examination, solicited Foreman's admission that he had entered into a plea bargain agreement with the state and plead guilty to the charge of conspiracy. Appellant's counsel did not object to this line of questioning or the subsequent admission of the plea agreement.[40]

We further note that the trial court failed to give a limiting instruction to the jury to the effect that Foreman's guilty plea was not to be considered as evidence of appellant's guilt.

■ The general rule in this jurisdiction is that where two or more persons are charged with the same offense, the fact that one defendant has plead guilty is not admissible as substantive evidence of the other's guilt. *State v. McDonald*, 117 Ariz. 159, 571 P.2d 656 (1977); *United States v.*

*King*, 505 F.2d 602 (5th Cir., 1974). The basis for this rule is founded upon the notion that a defendant is entitled to have the question of his guilt or innocence rest upon the evidence against him, rather than on a co-defendant's guilty plea to the same offense. *United States v. Fleetwood*, 528 F.2d 528, 532 (5th Cir. 1976); *Babb v. United States*, 218 F.2d 538, 542 (5th Cir. 1955). However, the introduction of a co-defendant's guilty plea is permissible for certain limited purposes such as where it tends to impeach a witness' credibility in order to prevent the defense from creating a misleading impression that the state has something to hide. *State v. McDonald*, 117 Ariz. at 161, 571 P.2d at 658, *United States v. King*, 505 F.2d at 607; *United States v. Del Purgatorio*, 411 F.2d 84, 87 (1969).

■ In light of the defense's opening remarks, we are not convinced that the evidence in question was erroneously admitted. In our opinion, the state was entitled to purge any possible misimpression left by the defense to the effect that the state was secreting material information which directly bore on a forthcoming witness' credibility. However, even assuming that the evidence was improperly admitted, the fact that a jury is informed of a co-defendant's guilty plea does not automatically constitute "fundamental" error. *State v. McDonald, United States v. King.* This would be true even if the trial court subsequently failed to give a limiting instruction. *State v. McDonald, United States v. King.* Therefore, under ordinary circumstances, appellant's failure to object to the admission of such evidence or request a cautionary instruction would bar him from raising the issue on appeal.[41] *State v. Wilson*, 113

---

**39.** We note that the state was specifically precluded from addressing this subject in its opening statement.

**40.** Furthermore, appellant's counsel readdressed the subject of the guilty plea during his cross-examination of Foreman and in his closing argument to the jury. The state also addressed the subject matter in its final closing argument.

**41.** The state contends that appellant never requested a cautionary instruction to the effect that Foreman's guilty plea was not to be considered as substantive of appellant's guilt. We agree. Appellant, on the other hand, claims that the following requested instruction, which the court rejected, qualified as such an instruction:

One who testifies under a partial grant of immunity with a promise from the government that he will not be prosecuted for some

Ariz. 308, 553 P.2d 235 (1976). Rule 19.3, 21.3, Arizona Rules of Criminal Procedure, 17 A.R.S.

However, in *McDonald*, our Supreme Court held that if a jury is informed of a co-defendant's guilty plea, but no cautionary instruction is requested or given, the reviewing court must examine the facts and circumstances of the case in order to determine whether the jury's verdict was possibly influenced thereby prejudicing the appellant's case to the extent that it constituted "fundamental" error. However, as noted earlier, the evidence of appellant's guilt on the substantive counts was simply overwhelming. As a result, any error in the introduction of the guilty plea or in the trial court's failure to instruct on its effect was harmless beyond a reasonable doubt. *State v. McDonald, Chapman v. California.*

Appellant further contends that the admission of Leonard Foreman's plea agreement constituted "fundamental" error. For the same reasons previously discussed, we find that any error in the admission of such evidence was harmless beyond a reasonable doubt. *Chapman v. California.*

In section XI of appellant's opening brief in 1 CA–CR 3376, he sets forth numerous miscellaneous points which he contends require reversal. Since appellant has not argued these propositions, we consider them to be abandoned. Rule 31.13, Arizona Rules of Criminal Procedure, 17 A.R.S.; *State v. Smith.*

We have also reviewed the remaining issues asserted by appellant, with the exception of those we specifically declined to

address relating to the tax count, and find them totally without merit. Therefore, in accordance with the foregoing opinion, appellant's conviction and sentence on Count Twelve (failure to file a state corporate income tax return) is reversed and remanded for a new trial, while his conviction and sentence on Count Three (false book entry) is affirmed.

FROEB, P. J., and DONOFRIO, J., concur.

---

offenses or has been given promises with respect to sentences he will receive, is a competent witness. His testimony may be received in evidence and considered by the jury even though not corroborated or supported by other evidence.

Such testimony, however, should be examined by you with greater care than the testimony of an ordinary witness. You should consider whether the testimony may be colored in such a way as to further the witness's own interest, for a witness who realizes that he may procure his own freedom by incriminating another has a motive to falsify. After such consideration, you may give the testimony of the immunized witness such weight as you feel it deserves.

In our opinion, not only was the above instruction insufficient to warn the jury as to the effect of a co-defendant's plea, it could have had the opposite effect and mislead the jury into believing that it could consider the guilty plea as evidence of appellant's guilt. Furthermore, we believe that the trial court did not err in refusing to give the above instruction because the same subject matter was adequately covered by the instructions actually given by the court. *State v. Kelley*, 110 Ariz. 196, 515 P.2d 569 (1973).