228 P.3d 909

**STATE of Arizona, Appellee,**

v.

**FAR WEST WATER & SEWER INC., Appellant.**

**No. 1 CA–CR 06–0160.**

Court of Appeals of Arizona, Division 1, Department E.

April 6, 2010.

As Amended May 4, 2010.

Terry Goddard, Attorney General by Kent E. Cattani, Chief Counsel, Criminal Appeals/Capital Litigation Section, and Nicholas D. Acedo, Assistant Attorney General, Craig W. Soland, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Law Offices of Andrew J. Capestro by Andrew J. Capestro, Rancho Santa Fe, CA, and Byrne, Benesch & Villarreal, P.C. by Arturo I. Villarreal, Yuma, Attorneys for Appellant.

## OPINION

WEISBERG, Judge.

¶ 1 Far West Water & Sewer, Inc. ("Far West") appeals its convictions and sentences for negligent homicide, aggravated assault, two counts of endangerment and violating a safety standard or regulation which caused the death of an employee.[1] We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12–120.21(A)(1) (2003), 13–4031 (2001), and 13–4033(A) (2001). For reasons that follow, we affirm Far West's convictions and sentences.

## PROCEDURAL HISTORY[2]

¶ 2 The charges arose from an incident that occurred on October 24, 2001 at a sewage collection and treatment facility owned and operated by Far West, an Arizona corporation. At that time, Santec Corporation ("Santec") was a subcontractor of Far West. A Far West employee, James Gamble, and a Santec employee, Gary Lanser, died in an underground tank after they were overcome by hydrogen sulfide gas. Another Far West employee, Nathan Garrett, suffered severe injuries when he attempted to rescue Gamble from the tank. Other Far West and Santec employees were involved in rescue attempts, but none was injured to a significant degree.

¶ 3 Far West was indicted for two counts of manslaughter for the deaths of Gamble and Lanser, one count of aggravated assault as to Garrett, four counts of endangerment as to Gamble, Garrett and two Santec employees, Shawn Hackbarth and Eric Andre, and one count of violating a safety standard or regulation that caused the death of Gamble. Far West's president, Brent Weidman, one of its forepersons, Connie Charles, and Santec were also indicted for the same or similar charges.

¶ 4 Santec pled guilty to one count of violating a safety standard or regulation that caused the death of its employee, Lanser. It was placed on probation for two years and fined $30,000. Charles pled guilty to two counts of endangerment as to Gamble and Garrett and was placed on concurrent one-year terms of probation.

¶ 5 On the State's motion, the trial court severed the trials of Far West and Weidman. The jury acquitted Far West of both counts of manslaughter as to Gamble and Lanser, but found it guilty of one count of the lesser-included offense of negligent homicide for the death of Gamble, one count of aggravated assault as to Garrett, two counts of endangerment as to Gamble and Garrett, and one count of violating a safety standard or regulation that caused the death of Gamble.[3]

¶ 6 The court ordered the sentences suspended and placed Far West on four years' probation for negligent homicide, five years' probation for aggravated assault and three years' probation for each count of endanger-

---

1. *See* A.R.S. §§ 13–1102(A)(2001) (negligent homicide); 13–1204(A)(1)(2001) (aggravated assault); 13–1201(A) (2001) (endangerment); and 23–418(E) (1995) (knowing violation of a safety standard or regulation that causes the death of an employee).

2. The factual history is more fully provided in Section B below.

3. The trial court granted Far West's motion for judgment of acquittal on two counts of endangerment for the Santec employees. Weidman was later convicted of two counts of negligent homicide and two counts of endangerment.

ment and for violating a safety standard or regulation that caused the death of an employee. It ordered some terms of probation to run concurrently and others to run consecutively. The court imposed fines and penalties totaling $1,770,000. On appeal, Far West argues as follows:

1. Far West cannot be prosecuted under general criminal laws for conduct involving the failure to maintain a safe workplace because federal law preempts it and/or A.R.S. § 23–418(E) provides the exclusive criminal sanction for such conduct;

2. By allowing Far West to be prosecuted under general criminal laws for failure to maintain a safe workplace, the trial court violated A.R.S. § 13–103(A), which abolished all common law criminal offenses;

3. Far West is not a "person" for purposes of imposing criminal liability;

4. The indictment was insufficient;

5. The evidence was insufficient to support the convictions;

6. The trial court erred when it admitted Weidman's out-of-court statements at trial;

7. The jury instructions impermissibly created strict liability;

8. The trial court erred when it refused to give Far West's requested jury instructions;

9. The trial court erred when it did not allow evidence of industry standards until the thirteenth day of trial;

10. The trial court erred when it admitted evidence obtained during an investigation conducted by the Arizona Division of Occupational Safety and Health;

11. The trial court erred when it denied a mistrial following a reference to an original co-defendant's guilty plea;

12. The trial court erred when it excused a juror; and

13. The fines and penalties imposed by the trial court were excessive.

## DISCUSSION

### A. Denials of Motions to Dismiss

¶ 7 In motions to dismiss made before and during trial, Far West challenged the underlying legal basis for the charges of man-slaughter, aggravated assault and endangerment, claiming its criminal prosecution was precluded as a matter of law. In a separate pretrial motion to dismiss, Far West challenged the sufficiency of the indictment. We review the decision to grant or deny a motion to dismiss for abuse of discretion. *State v. Pecard*, 196 Ariz. 371, 376, ¶ 24, 998 P.2d 453, 458 (App.1999). Matters of statutory construction and interpretation are questions of law which we review de novo. *State v. Nelson*, 208 Ariz. 5, 7, ¶ 7, 90 P.3d 206, 208 (App.2004).

### 1. Prosecution Not Barred by Federal or State Law

¶ 8 In 1970, Congress enacted the Occupational Safety and Health Act ("OSHA"). *See* 29 U.S.C. §§ 651 to –678. The purpose of OSHA was "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). Congress authorized the states to adopt standards that substantially complied with OSHA. 29 U.S.C. § 667(b).

¶ 9 Under this authority, the Arizona legislature enacted the Arizona Occupational Safety and Health Act. A.R.S. §§ 23–401 to –433 (1995) ("AOSHA"). It created a division of occupational health and safety within the Arizona Industrial Commission to recommend and enforce safety standards. *See* A.R.S. §§ 23–406,–407, –410. Arizona adopted the OSHA health and safety standards as published in 29 C.F.R. § 1910. *See* Ariz. Admin. Code R20–5–602.

¶ 10 Under A.R.S. § 23–403(A), "[e]ach employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees" ("the statutory duty"). Employers who knowingly violate the requirements of A.R.S. § 23–403(A) or other AOSHA safety standards may be subject to criminal penalties under A.R.S. § 23–418(E).

¶ 11 In 1977, the Arizona legislature enacted A.R.S. § 13–305, which permits an enterprise to be held criminally liable. An enter-

prise includes a corporation. A.R.S. § 13–105(15)(2001). Section 13–305 provides in relevant part:

A. [A]n enterprise commits an offense if:

1. The conduct constituting the offense consists of a failure to discharge a specific duty imposed by law; or

2. The conduct undertaken in behalf of the enterprise and constituting the offense is engaged in, authorized, solicited, commanded or recklessly tolerated by the directors of the enterprise in any manner or by a high managerial agent acting within the scope of employment.

A.R.S. § 13–305(A)(1), (2) (2001). " 'Agent' means any officer, director, employee of an enterprise or any other person who is authorized to act in behalf of the enterprise." A.R.S. § 13–305(B) (1) (2001). " 'High managerial agent' means an officer of an enterprise or any other agent in a position of comparable authority with respect to the formulation of enterprise policy." A.R.S. § 13–305(B)(2).

¶ 12 Far West filed a motion to dismiss the charges brought under the Arizona Criminal Code for manslaughter, aggravated assault and endangerment ("Title 13 offenses").[4] Assuming that its criminal liability was based solely on a "failure to discharge a specific duty imposed by law" under A.R.S. § 13–305(A)(1) and a failure to provide a safe workplace under A.R.S. § 23–403(A), Far West argued that the OSHA provision set forth in 29 U.S.C. § 653(b)(4) ("the savings clause") preempted the State's prosecution under Title 13. It also argued that A.R.S. § 23–418(E) provided the exclusive criminal sanction for a violation of the statutory duty. Far West further claimed that by charging it with Title 13 offenses, the State violated

A.R.S. § 13–103(A), which abolished all common law offenses.

¶ 13 The trial court denied the motion to dismiss. The court found that the duty to provide a safe workplace was not the statutory duty, but rather was the established common law duty of an employer to provide a safe workplace to an employee. *See Smith v. Goodman,* 6 Ariz.App. 168, 172, 430 P.2d 922, 926 (1967) (employer has a duty to " 'furnish [an] employee a reasonably safe place in which to work and reasonably safe instrumentalities with which to do his work' ") (quoting *Morrell v. City of Phoenix,* 16 Ariz. 511, 513, 147 P. 732, 734 (1915)). The court ruled that OSHA did not preempt application of general criminal laws to Far West and that A.R.S. § 23–418(E) was not the exclusive criminal sanction available to the State for the failure to discharge that duty. We consider each related argument in turn.[5]

**a. Preemption by OSHA Savings Clause**

¶ 14 Far West argues that, except for the criminal penalties found in A.R.S. § 23–418(E), the OSHA savings clause preempts the State from prosecuting employers under Title 13 for failure to provide safe working conditions under standards set forth in AOSHA.[6] The OSHA savings clause provides that:

Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

29 U.S.C. § 653(b)(4). Far West claims that this enforcement of general criminal laws

---

4. Weidman filed a separate motion to dismiss and the other defendants joined in the motions. The court denied all motions in a consolidated order.

5. After the close of evidence, the jury was instructed on both the common law duty to provide a safe workplace and the statutory duty. It was also instructed that a corporation could be held criminally liable under either A.R.S. § 13–305(A)(1) or 13–305(A)(2).

6. Although Far West cited 29 U.S.C. § 653(b)(4)(the savings clause) in a footnote in its opening brief, it argued for the first time in its reply brief that criminal prosecution under Title 13 was preempted by the OSHA savings clause. While we may disregard arguments raised for the first time in a reply brief, if the issue was argued by the parties below and raises an important point of law, we have discretion to consider it, as we do here. *State v. Shipman,* 208 Ariz. 474, 475, n. 2, ¶ 4, 94 P.3d 1169, 1170, n. 2 (App. 2004).

impermissibly enlarges an employer's duties and liabilities under AOSHA in violation of the savings clause.

¶ 15 While no Arizona case has addressed this issue, jurisdictions considering it have uniformly held that the OSHA savings clause does not preempt prosecution under state criminal laws. For example, in *People v. Chicago Magnet Wire Corp.*, 126 Ill.2d 356, 128 Ill.Dec. 517, 534 N.E.2d 962, 965 (1989), corporate officers were charged with several criminal offenses after numerous employees suffered physical injuries due to their exposure to toxic substances, inadequate ventilation and dangerously overheated working conditions. The indictments claimed the defendants knowingly and recklessly caused the injuries by failing to provide the employees with necessary safety precautions to avoid harmful exposure to the poisonous substances. The defendants argued that OSHA preempted the prosecutions on several grounds. The Supreme Court of Illinois disagreed and reversed the appellate court, which had affirmed an order dismissing the indictments. *Id.* 128 Ill.Dec. 517, 534 N.E.2d at 963–64.

¶ 16 The Illinois Supreme Court discussed the doctrine of federal preemption under the Supremacy Clause of the United States Constitution and analyzed the language, history and purpose of OSHA. The court held that, "[t]here is nothing in the structure of OSHA or its legislative history which indicates that Congress intended to preempt the enforcement of State criminal law prohibiting conduct of employers that is also governed by OSHA safety standards." *Id.* 128 Ill.Dec. 517, 534 N.E.2d at 966. The court stated that:

> We cannot see that State prosecution of employers for conduct which is regulated by OSHA would conflict with the adminis-

tration of OSHA regulations or be at odds with its goals or purposes. On the contrary, prosecution of employers who violate State criminal law by failing to maintain safe working conditions for their employees will surely further OSHA's stated goal of "assur[ing] so far as possible every working man and woman in the Nation safe and healthful working conditions." (29 U.S.C.A. § 651(b) (1982)). State criminal law can provide valuable and forceful supplement to insure that workers are more adequately protected and that particularly egregious conduct receives appropriate punishment.

*Id.* 128 Ill.Dec. 517, 534 N.E.2d at 969. *Accord People v. Hegedus*, 432 Mich. 598, 443 N.W.2d 127, 137–38 (1989) (OSHA did not preempt state prosecution for manslaughter when worker died from carbon monoxide poisoning in company-owned van); *People v. Pymm*, 76 N.Y.2d 511, 561 N.Y.S.2d 687, 563 N.E.2d 1, 4 (1991) (OSHA did not preempt criminal prosecution of corporate officers when employees suffered serious physical injuries caused by mercury contamination, in part because savings clause allows "continued viability of statutory and common law duties"); *Sabine Consol., Inc. v. State*, 806 S.W.2d 553, 559–60 (Tex.Crim.App.1991) (OSHA did not preempt criminal prosecutions of corporation and its president for negligent homicide when two employees died after walls of a trench collapsed and buried them); *State ex rel. Cornellier v. Black*, 144 Wis.2d 745, 425 N.W.2d 21, 25 (Ct.App.1988) (OSHA did not preclude state from charging officer and manager of fireworks plant with homicide by reckless conduct following fire and explosion which killed employee). We similarly conclude that the savings clause does not preclude other criminal prosecution.[7]

---

**7.** In its reply brief, Far West cites *Pruett v. Precision Plumbing*, 27 Ariz.App. 288, 293, 554 P.2d 655, 660 (1976), for the proposition that under the savings clause, "OSHA will not support a civil cause of action for personal injuries to an employee or a subcontractor." Therefore, it cannot be the basis of criminal liability. In *Pruett*, however, under prior Arizona law (rejected in *Lewis v. N.J. Riebe Enters., Inc.*, 170 Ariz. 384, 389, 825 P.2d 5, 10 (1992)), there was no recognized duty of a general contractor to an employ-

ee of a subcontractor. Absent a duty imposed by common law, contract or another statute, a violation of OSHA alone does not support a civil cause of action. *See Wendland v. AdobeAir, Inc.*, 223 Ariz. 199, 202, ¶ 13, 221 P.3d 390, 393, (App.2009). Here, the State did not use OSHA to create criminal liability where none otherwise existed as Arizona law permits employers to be held criminally liable for their conduct if the evidence supports it.

### b. A.R.S. § 23–418(E) as Sole Sanction

■ ¶ 17 Far West next argues that A.R.S. § 23–418(E) provides the exclusive criminal sanction for an employer who fails to perform the duty to maintain a safe workplace. Under A.R.S. § 23–418(E), "[a]ny employer who knowingly violates the requirements of A.R.S. § 23–403 or any standard or regulation adopted pursuant to § 23–410 or 23–414 or any provision of this article and that violation causes death to an employee is guilty of a class 6 felony, except that if the conviction is for a second or subsequent violation the employer is guilty of a class 5 felony."

¶ 18 Under the theory that a more specific statute controls over a general one, Far West asserts that when the legislature enacted AOSHA with the specific penalties found in A.R.S. § 23–418(E), it intended to preclude the State from obtaining convictions with harsher criminal penalties under the general provisions of Title 13. Far West also claims that to conclude otherwise renders A.R.S. § 23–418(E) superfluous. We, however, disagree.

■■ ¶ 19 "Our primary task in construing a statute is to identify and give effect to legislative intent." *State v. Takacs*, 169 Ariz. 392, 395, 819 P.2d 978, 981 (App.1991). In doing so, we give words their "plain and ordinary meaning" [and] "apply a practical and commonsensical construction." *State v. Alawy*, 198 Ariz. 363, 365, ¶ 8, 9 P.3d 1102, 1104 (App.2000). "To the extent possible, the courts must enforce all statutes that have been duly enacted [and] it is the court's 'obligation to harmonize related statutes,' and this obligation 'applies even where the statutes were enacted at different times and contain no reference one to the other.'" *Hounshell v. White*, 219 Ariz. 381, 385, ¶ 12, 199 P.3d 636, 640 (App.2008) (citations omitted). "[It] is immaterial to this endeavor that the statutes are found in different titles." *Id.* "[W]hen reconciling two or more statutes, courts should construe and interpret them, whenever possible in such a way so as to give effect to all the statutes involved." *Pima County By City of Tucson v. Maya Constr. Co.*, 158 Ariz. 151, 155; 761 P.2d 1055, 1059 (1988). Finally, "[w]e will

also look to the policy behind the statute and to the evil that it was designed to remedy." *State v. Takacs*, 169 Ariz. at 395, 819 P.2d at 982.

■ ¶ 20 There is nothing in the language of A.R.S. § 23–418(E) or any other provision of AOSHA to indicate that the legislature intended A.R.S § 23–418(E) be the exclusive criminal sanction against an employer who violates the statutory duty thereby causing the death or serious harm of an employee. Further, the principle that the specific law controls over the general law "applies only where the specific conflicts with the general." *State v. Weiner*, 126 Ariz. 454, 456, 616 P.2d 914, 916 (App.1980). "This conflict arises only where the elements of proof essential to conviction under each statute are exactly the same [and] if the two statutes do not contain the same elements, the legislature is presumed not to have precluded the state from prosecuting under either at the state's option." *Id.* Thus, "where there is no conflict between two statutes, a criminal offense may be prosecuted under either statute where the facts are such that they fall within the prohibitions of both." *State v. Mussiah*, 141 Ariz. 212, 214, 685 P.2d 1364, 1366 (App.1984); A.R.S. § 13–116 (2001)("[a]n act or omission which is made punishable in different ways by different sections of the laws may be punished under both, . . . .").

¶ 21 Here, the elements of proof essential to find guilt under A.R.S. § 23–418(E) are not identical to the elements of proof essential to find guilt under the relevant Title 13 offenses. Because there is no conflict between that specific statute and the general criminal statutes, we conclude that the legislature did not intend to preclude the state from prosecuting Far West under any other applicable statute.

¶ 22 We also reject Far West's argument that prosecution under Title 13 renders A.R.S. § 23–418(E) superfluous. "When conduct can be prosecuted under two or more statutes, the prosecutor has discretion to determine which statute to apply." *State v. Lopez*, 174 Ariz. 131, 143, 847 P.2d 1078, 1090 (1992). In making that determination, a prosecutor may consider the available penal-

ties upon conviction. *State v. Patton,* 136 Ariz. 243, 246, 665 P.2d 587, 590 (App.1983). The fact that a prosecutor exercises such discretion and chooses to apply a statute with a harsher penalty does not render A.R.S. § 23–418(E) superfluous.

¶ 23 In an analogous context, we note that in interpreting the preclusive effect of criminal penalties in OSHA for violations of OSHA standards, other courts have consistently held that the "very minor criminal sanctions" found in OSHA do not "preclude state [criminal] penalties" as Congress intended "to allow states to supplement OSHA penalties with their own sanctions." *People v. Hegedus,* 443 N.W.2d at 136–37 (citation omitted). *See also People v. Chicago Magnet Wire Corp.,* 128 Ill.Dec. 517, 534 N.E.2d at 967 (holding that it is unreasonable to conclude Congress intended OSHA to provide the only criminal sanctions available so as to preclude other "appropriate criminal sanctions in cases of egregious conduct causing serious or fatal injuries to employees"); *Sabine Consol., Inc.,* 806 S.W.2d at 557 (stating that OSHA penalty provisions "are not designed to cover a broad range of criminal conduct ... [and] "[w]hereas OSHA standards apply only to specific hazards in the workplace, criminal law reaches to regulate conduct in society in general"); *Pymm,* 561 N.Y.S.2d 687, 563 N.E.2d at 6 (OSHA remedies are "prophylactic measures that are intended to prevent workplace accidents from ever occurring ... [while] [s]tate criminal prosecutions lead to the imposition of penalties that reflect society's condemnation of behavior in violation of generally accepted norms").

¶ 24 Similarly, it is unreasonable to suppose the Arizona legislature intended that the minor sanctions in A.R.S. § 23–418(E) be the exclusive remedy for an employer's egregious failure to maintain a safe workplace that results in death or serious physical injury, without regard to the wrongful conduct at issue. Section 23–418(E) does not provide any criminal penalty for an employer's negligent or reckless *conduct* that results in death or serious physical injury to an employee, or reckless *conduct* that results in the risk of imminent death or serious physical injury to

an employee. Limiting criminal sanctions under A.R.S. § 23–418(E) would effectively immunize employers from liability for wrongdoing that threatens or results in death or serious physical injury to an employee. There is nothing to indicate the legislature intended this result.

¶ 25 Moreover, while the purpose of sanctions for a violation of AOSHA is to enforce health and safety standards in the workplace, the purpose of general criminal laws is to "deter conduct that society has labeled intolerable and morally repugnant...." *Pymm,* 561 N.Y.S.2d 687, 563 N.E.2d at 6. Adopting Far West's position would defeat this purpose. We therefore conclude that A.R.S. § 23–418(E) is not the exclusive criminal penalty for an employer's failure to discharge its statutory duty to provide a safe workplace.

### c. Violation of A.R.S. § 13–103(A)

¶ 26 Finally, Far West asserts the trial court impermissibly created new criminal law when ruling that it could be prosecuted for failure to fulfill the statutory or common law duty to provide a safe workplace, an offense not codified by any criminal statute. Far West contends this violates A.R.S. § 13–103(A) (2001) because under that statute "[a]ll common law offenses ... are abolished [and] [n]o conduct or omission constitutes an offense ... unless it is an offense ... under this title or under another statute or ordinance." *See State v. Rios,* 217 Ariz. 249, 250, ¶ 6, 172 P.3d 844, 845 (App.2007) ("Arizona law proscribes only those offenses ... identified as crimes in the governing statutes or ordinances."). We disagree.

¶ 27 We first observe that "[t]he minimum requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform a duty imposed by law...." A.R.S. § 13–201(2001). "Conduct" is "an act or omission and its accompanying mental state." A.R.S. § 13–105(5) (2001).

¶ 28 In this case, the State did not charge Far West with a separate offense of failing to discharge the duty to provide a safe workplace. Rather, the State charged Far

West with violating specific criminal statutes for conduct defined by those statutes and undertaken as an enterprise pursuant to A.R.S. § 13–305. Significantly, although section 13–103(A) abolished common law offenses, it did not abolish the use of common law, statutory or other duties imposed by law as a basis for criminal liability under statutorily defined offenses.

¶ 29 For example, in *State v. Brown,* 129 Ariz. 347, 631 P.2d 129 (App.1981), the defendant operated a boarding house and provided care to a 98–year old woman. Because of her medical condition, the health department obtained a court order that required the defendant cease providing care and lodging to her. Instead, the defendant hid the woman in a different location and put her in the care of a seventeen-year old girl. Due to lack of proper care, the woman died of starvation. *Id.* at 348, 631 P.2d at 130.

■ ¶ 30 The defendant was convicted of, among other crimes, manslaughter. On appeal, the defendant claimed in part that because the jury was improperly instructed on her duty toward the victim, she was convicted of acts which were not crimes. The Supreme Court disagreed, noting that in some circumstances under which one person owes a legal duty to another, but neglects the legal duty and death is the immediate and direct result, that person may be charged with manslaughter. *Id.* at 349, 631 P.2d at 131. As applicable here, the court held that "the failure to perform a duty imposed by law may create criminal liability. In the case of negligent homicide or manslaughter, the duty must be found outside the definition of the crime itself, perhaps in another statute, or in the common law or in a contract." *Id.* Accord *West v. Commonwealth,* 935 S.W.2d 315 (Ky.App.1996) (defendants could be convicted of reckless homicide for failing to provide care to disabled person where duty to provide care arose from a state statute outside

definition of crime itself); *Commonwealth v. Pestinikas,* 421 Pa.Super. 371, 617 A.2d 1339 (1992) (defendants could be convicted of third degree homicide for failure to provide food and medical care that caused death of victim where duty to provide care arose from oral contract).[8] Here, the fact that the relevant duty to provide a safe workplace was not within the definitions of the charged Title 13 offenses did not violate A.R.S. § 13–103(A).

## 2. Far West as a "Person" for Criminal Liability

■ ¶ 31 In a motion to dismiss made during trial, Far West argued, among other issues, that it was not a "person" for purposes of imposing criminal liability for manslaughter, aggravated assault or endangerment because only human beings can be held criminally liable for those crimes. Although denying the motion to dismiss on other grounds, the trial judge expressed his complete disagreement with Far West's position.

¶ 32 Arizona's criminal code defines "person" as "a human being and, as the context requires, an enterprise, a public or private corporation, an unincorporated association, a partnership, a firm, a society, a government, a governmental authority or an individual or entity capable of holding a legal or beneficial interest in property." A.R.S. § 13–105(26) (2001). There is nothing to indicate that by inclusion of the phrase "as the context requires," the legislature sought to exclude corporations from the definition of "person" for certain offenses. Further, not only did the legislature include corporations in the definition of person, the legislature described how corporations, as enterprises, can commit criminal offenses through the acts or omissions of their directors, high managerial agents and/or agents. A.R.S. § 13–305(A).

¶ 33 Our interpretation is also supported by the language of the statutes that prescribe penalties for commission of criminal

---

8. In the absence of duty imposed by law, due process concerns may bar a criminal prosecution. *See State v. Angelo,* 166 Ariz. 24, 800 P.2d 11 (App.1990) (corporate officers could not be charged with offense of failing to file transaction privilege tax returns because Arizona law does not impose duty on them to file and they did not have notice of possible criminal liability for failure to do so); *State v. Lisa,* 391 N.J.Super. 556, 919 A.2d 145 (App.Div.2007) (defendant could not be charged with reckless manslaughter for failure to call emergency services after companion overdosed on drugs as there is no independent duty to aid another and defendant did not have notice that failure to render aid could subject him to criminal liability).

offenses. Section 13–603 sets forth the authorized disposition of offenders and contains provisions specific to an "enterprise" that commits a criminal offense. A.R.S. § 13–603(F), (G) (2001). Section 13–803 provides for the imposition of fines against "enterprises" convicted of criminal offenses. A.R.S. § 13–803(2001). We therefore conclude that Far West was a person for purposes of imposing criminal liability for Title 13 offenses.

### 3. Sufficiency of the Indictment

¶ 34 Far West next contends the trial court erred when it denied its motion to dismiss based on insufficiency of the indictment which, it claims, prevented it from preparing an adequate defense. In particular, Far West claims the indictment should have contained specific facts and circumstances surrounding the incident which gave rise to the offenses charged.

¶ 35 A trial court should grant a motion to dismiss if the indictment is insufficient as a matter of law. *State v. Wood,* 198 Ariz. 275, 277, ¶ 6, 8 P.3d 1189, 1191 (App. 2000); Ariz. R.Crim. P. 16.6(b). We review the denial of a motion to dismiss based on insufficiency of the indictment for abuse of discretion. *Wood,* 198 Ariz. at 277, ¶ 6, 8 P.3d at 1191.

¶ 36 An indictment must give a defendant notice of the crime charged. *State v. Arnett,* 158 Ariz. 15, 18, 760 P.2d 1064, 1067 (1988). However, "[t]here is no requirement that the defendant receive notice of how the State will prove the alleged offense." *Id.* Under the rules of procedure, "nothing more is required than that the indictment [ ] be a plain, concise statement of the facts sufficiently definite to inform the defendant of the offense charged." *State v. Magana,* 178 Ariz. 416, 418, 874 P.2d 973, 975 (App. 1994); Ariz. R.Crim. P. 13.2(a). An indictment is legally sufficient if it informs the defendant of the essential elements of the charge, is definite enough to permit the defendant to prepare a defense against the charge, and affords the defendant protection from subsequent prosecution for the same offense. *State v. Rickard–Hughes,* 182 Ariz. 273, 275, 895 P.2d 1036, 1038 (App.1995). In considering whether an indictment provides

sufficient notice, the indictment "must be read in the light of the facts known by both parties." *Magana,* 178 Ariz. at 418, 874 P.2d at 975.

¶ 37 The indictment here provided Far West with sufficient notice of the crimes charged. Each count identified the defendant, the victim, the offense charged, the date of the offense, the location of the offense, the elements of the offense, the type and class of offense and all applicable statutes. Further, each count mirrored the language of the applicable statutes which defined each offense. The indictment was thereby sufficient to enable Far West to defend against the charged offenses.

### B. Sufficiency of the Evidence

¶ 38 After the verdicts, Far West unsuccessfully moved for a judgment of acquittal on the ground that there was no substantial evidence to warrant the convictions. Ariz. R.Crim. P. 20(b). On appeal, Far West argues there was insufficient evidence to support its convictions for the charged offenses. "Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction." *State v. Soto–Fong,* 187 Ariz. 186, 200, 928 P.2d 610, 624 (1996) (citation omitted). "To set aside a jury verdict for insufficient evidence, it must clearly appear that under no hypothesis whatever is there sufficient evidence to support the conclusion reached by the jury." *State v. Arredondo,* 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987). In our review of the evidence, "[w]e construe the evidence in the light most favorable to sustaining the verdict, and resolve all reasonable inferences against the defendant." *State v. Greene,* 192 Ariz. 431, 436, ¶ 12, 967 P.2d 106, 111 (1998). We resolve any conflict in the evidence in favor of sustaining the verdict. *State v. Guerra,* 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989).

### 1. The Incident

¶ 39 Far West owned and operated several wastewater treatment plants in Yuma. Weidman, who has a master's degree in industrial engineering and a Ph.D. in construc-

tion engineering, had been Far West's president and chief operating officer for nine years. Rex Noll, who had extensive training and experience in sewage and wastewater treatment plants, was the supervisor for the sewage division of Far West and reported directly to Weidman. Charles was in charge of the sewer crews and was under Noll's supervision.

¶ 40 Prior to the incident, Far West acquired the Mesa Del Oro Plant and hired Santec to renovate equipment in an underground sewage tank called the Mesa Del Oro Tank ("the Tank"). The 3,000 gallon tank was approximately nine feet underground. The interior of the Tank could only be accessed by descending down a ladder into a manhole approximately four feet wide. Two sewer lines fed into the Tank. The gravity line carried sewage downhill by gravitational force. The force main line carried sewage pumped by force main pumps from another tank or lift station, approximately one mile away.

¶ 41 On October 24, 2001, Far West and Santec began work on the Tank. The Far West crew included Gamble and Garrett with Charles supervising. The Santec crew included Lanser, Andre, and Hackbarth. After the force main pumps at the lift station were shut off, Gamble and Garrett pumped out the sewage from the surface and cleaned out the remaining sewage from inside the Tank. As part of this process, Gamble inserted a plug into the gravity line to stop the flow of sewage. After the Santec crew finished upgrading the Tank, it was ready to have sewage pumped into it.

¶ 42 Normally, the crew would pull the gravity line plug and exit the Tank before turning on the force main pump. On this occasion, however, Charles wanted to turn the force main pumps on first because she was concerned that the lift station was overflowing. Although there is conflicting evidence on this point, for reasons that are not clear from the record, Charles told Gamble to enter the Tank to pull out the gravity line plug once the Tank was about half-full of sewage. Charles then drove to the lift station, turned on the pumps and sewage began flowing into the Tank. In a radio communica-

tion, Charles asked Gamble if the Tank was half-full and inquired, "[i]s the plug out yet? Is the plug out yet?" As sewage was flowing into the Tank, Gamble climbed inside the Tank to unplug the gravity line. When the lower part of his body was in the Tank, he passed out and fell into the sewage.

¶ 43 Garrett saw Gamble floating facedown in the Tank. In an effort to rescue him, Garrett tied a rope around his waist, told Andre to hold it and climbed down a ladder into almost waist-deep sewage. Not able to get Gamble out of the Tank, Garrett tried to climb up the ladder but passed out before he reached the top. Lanser then climbed down the manhole in an attempt to rescue both Gamble and Garrett, passed out and fell into the Tank. At some point, Hackbarth radioed to Charles to turn off the pumps and call 911. Charles rushed back to the Tank and entered it in an effort to rescue Gamble, Garrett and Lanser. She, too, passed out, but eventually regained consciousness.

¶ 44 Emergency personnel arrived at the scene. A paramedic found Charles near the top of the ladder, but unable to get out. With assistance, he pulled her to the surface. Garrett was tied to the ladder below Charles and unable to move. The paramedic put on a self-contained breathing apparatus, climbed into the Tank, and with the help of others, pulled Garrett out. The Yuma Fire Department's technical rescue team, with specialized training in confined space entry, later recovered the bodies of Gamble and Lanser.

¶ 45 Dr. Daniel Teitelbaum, a physician specializing in occupational medicine and toxicology, and an OSHA expert and consultant, concluded that Gamble and Lanser died from acute hydrogen sulfide poisoning which occurred in a confined space. The Yuma County medical examiner concluded that both were overcome by inhalation of sewage gas but the immediate cause of death was asphyxia due to drowning. Although Garrett survived, he suffered life-threatening respiratory distress syndrome and aspiration pneumonia and sustained injuries to his lungs and eyes.

## 2. Safety Standards for Confined Spaces

¶ 46 Immediately after the incident, compliance officers of the Arizona Division of Occupational Health and Safety ("ADOSH") began an investigation. After surveying the Mesa Del Sol plant, conducting employee and witness interviews and reviewing company information, ADOSH concluded that the Tank was a permit-required confined space ("permit space") subject to strict and detailed OSHA regulations governing entry into such spaces to protect employees from permit space hazards.[9] Following its investigation, OSHA cited and fined Far West for multiple serious violations for its failure to comply with such OSHA regulations.

¶ 47 Dr. Verne Brown, an OSHA expert, testified at trial that the Tank was a permit-required confined space subject to OSHA regulations. Under OSHA, before employees may enter such spaces, the employer must, among other things and as set forth in great detail by such regulations, (1) develop and implement a written permit-required confined space program; (2) provide adequate training to entrants and entry supervisors to make them aware of the hazards of entry into the space and enable them to safely perform their duties; (3) certify in writing that the required training has been provided; (4) identify and evaluate hazards prior to entry; (5) develop procedures and practices for safe permit space entry such as isolating permit space, eliminating or controlling atmospheric hazards and verifying that conditions in the space are acceptable for entry throughout the duration of the work; (6) test and monitor atmospheric hazards prior to and during entry; (7) provide equipment necessary for safe entry and rescue, including testing, monitoring, ventilating, communications, rescue and emergency equipment; (8) designate an authorized at-tendant to monitor the authorized entry into the space; (9) designate an entry supervisor responsible for determining if acceptable entry conditions are present, overseeing entry operations, and terminating entry; (10) consult and coordinate entry operations with third-party contractors; (11) provide or designate qualified rescue and emergency services; and (12) execute a written policy that controls and authorizes entry into permit spaces. *See generally* 29 C.F.R. § 1910.146.

¶ 48 The director of quality assurance for a wastewater treatment plant in Yuma testified that hydrogen sulfide gas forms readily in domestic sewage pipes. After a sewer line is plugged, a large quantity of hydrogen gas sulfide is generated and when sewage is released after being confined, levels of the gas can become lethal. She further testified about the City of Yuma's permit space entry procedures implemented to comply with OSHA. Other experts in the field similarly testified about the hazards of working in a wastewater treatment plant, the dangers associated with exposure to toxic gases found in confined spaces and the necessity of complying with OSHA regulations for such spaces.

¶ 49 Dr. Teitelbaum testified that working in a sewer environment is very dangerous, especially when sewage is flowing into it, as there is always the potential for the presence of toxic levels of hydrogen sulfide gas. He stated that a sewage treatment plant must have a written program for working in confined spaces to ensure that it is safe to enter them. In addition, it is necessary to have proper safety and protective equipment, adequate training, emergency treatment equipment and a rescue plan. He emphasized that "the critical thing is that there has to be a program written down. It has to be taught to the workers. You have to test the work-

9. A "confined space" is a space that "is large enough and so configured that an employee can bodily enter and perform assigned work [and] has limited or restricted means for entry or exit ... and is not designed for continuous employee occupancy." A "permit-required confined space" is a confined space if it has one or more of the following: "Contains or has a potential to contain a hazardous atmosphere; contains a material that has the potential for engulfing an entrant; has an internal configuration such that an entrant could be trapped or asphyxiated by inwardly converging walls or by a floor which slopes downward and tapers to a smaller cross-section; or contains any other recognized safety or health hazard." The employer must evaluate the workplace to determine if any confined spaces are permit-required spaces. *See* 29 C.F.R. § 1910.146(b), (c).

ers to make sure they learned it; and, then, somebody has to be there to make sure they actually do what the program requires."

### 3. Practices and Policies of Far West

¶ 50 Far West and Santec employees as well as others associated with Far West testified concerning the practices and procedures of Far West regarding entry into underground tanks prior to and at the time of the incident. The evidence showed that Far West made no attempt to even minimally comply with OSHA regulations. Far West employees entered underground tanks on a regular basis to clean and maintain them. Although the tanks were permit spaces, Far West had no written permit space program and never had permits before entering tanks. Far West did not inform Charles or other employees about the necessity for such permits before entering tanks. Charles had never seen a permit.

¶ 51 Far West did not provide its employees with required training regarding entry into permit spaces. Far West's employees were not even generally informed about the hazards caused by gases found in tanks and the potential life-threatening dangers involved in entering tanks. Noll indicated that Far West's policy was that employees should "train themselves" and "learn to be safe on their own." Shortly before the incident, Garrett, Gamble and Charles took an examination for certification as wastewater operators. Far West did not provide any training or classes to assist them. Instead, they were given books and told to study on their own time. Although they all failed the exam, Far West allowed them to continue working in permit spaces without proper training.

¶ 52 One of Noll's responsibilities was to make the job sites safe. Far West's safety program, however, was virtually non-existent. Far West did not have necessary safety procedures or equipment to protect its employees who entered confined spaces. Far West did not require its employees to perform atmospheric tests before entering a tank or to monitor the air while inside. Although Far West provided Charles with a gas meter that could detect the presence of hydrogen sulfide as well as other dangerous gases, Far West did not train her on its use. Charles, who has dyslexia, was given an instruction book and left to "figure it out on her own," but she never learned how to use it.

¶ 53 On the day of the incident, although there was an air blower on site used to blow out the air inside the Tank before entering it, the blower was broken. When Gamble entered the Tank, he was not wearing any safety equipment, such as a harness with a lifeline. Charles was not told that Gamble or others should have worn such equipment before entering the Tank. Although she was not trained as to safety requirements, Noll "left it in [Charles's] hands" to determine what safety equipment was needed.

¶ 54 Far West did not hold safety meetings and had no written safety polices or written records regarding safety training. Noll appointed Maria Arreaga as safety director of Far West, although he knew she was not qualified for the position. Arreaga was employed solely to translate meetings with Spanish speaking employees and hand out glasses, goggles, hardhats and gloves when employees requested. Weidman acknowledged Arreaga was a safety director "in name only." She had no background in safety and was not given any safety manuals. Arreaga never provided any safety materials or training to any employee of Far West and did not keep any records related to safety. Although she attended a seminar on confined space entry training and expressed her concerns to Noll that Far West was not in compliance with OSHA, she never conveyed any safety information to Far West employees and no changes were made.

¶ 55 Far West did not have necessary rescue equipment available, such as a self-contained breathing apparatus, a tripod or a lift system. It did not identify a rescue service to contact in case of an emergency. Indeed, on the day of the incident, Far West had no capability of rescuing anyone. Moreover, Far West did not coordinate with Santec as to any issues regarding entry into the Tank or safety and rescue measures.

¶ 56 Shortly after the incident, Far West replaced its safety director. The new di-

rector, Lloyd Stanton, determined that Far West's underground tanks were permit spaces, that Far West did not have a safety policy that complied with OSHA regulations, did not have a proper training program or rescue plan and had no records of any confined space entry permits, air testing results or safety meetings.

¶ 57 Both Weidman and Noll had extensive experience and training in the sewage and wastewater industry. They knew Far West employees entered underground tanks and knew sewer crews would enter the Tank because they walked the site prior to the incident. They knew the dangers of working in underground tanks and of the potential for being overcome by lethal gases. Weidman told investigators that the individuals were probably "overcome by hydrogen sulfide gas." Noll admitted that underground tanks were "unsafe" and one could be "overcome by gases."

¶ 58 Based on their years of experience in the industry and having attended OSHA-sponsored training courses that detailed Far West's obligations under OSHA, they knew that Far West was required to comply with OSHA regulations for permit spaces and understood what those regulations mandated. Indeed, approximately six months before the incident, a consultant and OSHA expert told Weidman and Noll that Far West had to implement permit space procedures and training, and specified the necessary safety equipment it was required to obtain. Far West did not do so. When asked by investigators why Far West did not have a permit space program, Weidman told them that "he had never taken the time to create one" and that he did not think Far West sewer crews needed one because "their entry took less than a minute." Noll admitted at trial that necessary equipment should have been on site and that "as far as safety goes," Far West "should have known better."

¶ 59 Rather than comply with OSHA regulations, Weidman and Noll "came up with" what Noll described as an agreement between themselves that would serve as Far West's "policy" regarding the entry of tanks. Weidman and Noll decided that if a tank was "clean," it was not a permit-space under

OSHA regulations. A tank was clean if it had been "aired out" using a blower, the air tested with a meter and any sewage lines "plugged off."

¶ 60 Based on their uncommon determination of what constituted a clean tank, they established Far West's unwritten "clean-hole policy" regarding the entry of tanks. The policy was simply not to go into a "dirty hole." This policy, however, was never communicated to Charles or other members of the sewer crew. They did not know about the prohibition against going into dirty holes. In fact, no one told Charles it was unsafe to go inside a tank to pull a gravity line plug allowing sewage to flow. Moreover, there was expert testimony that the clean-hole policy did not eliminate the hazards of toxic sewer gases and could not obviate the necessity for compliance with OSHA.

¶ 61 Dr. Verne Brown testified that Far West's failure to comply with OSHA regulations for permit spaces caused the incident. In particular, he opined that the incident occurred because Far West (1) lacked critical safety equipment required for permit-required confined space entry; (2) did not use an air monitor or blower; (3) lacked coordination and planning with Santec; (4) made no attempt to identify rescue services (5) never executed a permit for entry; and (6) did not adequately train its employees.

### 4. Elements of Offenses

¶ 62 Far West claims the evidence was insufficient to support the convictions against Far West because (1) Weidman and Noll were not high managerial agents acting within the scope of their employment; (2) Weidman and Noll did not engage in conduct or possess the requisite culpable mental states required for commission of each offense; and (3) Far West did not cause Gamble's death or Garrett's injuries. As to the charged offenses, "A person commits negligent homicide if, with criminal negligence, the person causes the death of another person." A.R.S. § 13–1102(A). " 'Criminal negligence' means with respect to a result or to a circumstance described by a statute defining an offense, that a person fails to perceive a substantial and unjustifiable risk that the

result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." A.R.S. § 13–105(9)(d) (2001).

¶ 63 Regarding aggravated assault, a person commits aggravated assault as charged in this case "if the person commits assault" and "causes serious physical injury to another." A.R.S. § 13–1204(A)(1). A person commits assault "by intentionally, knowingly or recklessly causing any physical injury to another person." A.R.S. § 13–1203(A)(1). " 'Recklessly' means, with respect to a result or to a circumstance described by a statute defining an offense, that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." A.R.S. § 13–105(9)(c)(2001). Regarding endangerment, "a person commits endangerment by recklessly endangering another person with a substantial risk of imminent death or physical injury." A.R.S. § 13–1201(A). Finally, under A.R.S. § 23–418(E), any employer who "knowingly" violates the requirements of A.R.S. § 23–403 to maintain a safe workplace or any standard or regulation adopted pursuant to Title 23, is guilty of a class 6 felony if that violation results in the death of an employee.

### 5. High Managerial Agents

¶ 64 The State presented substantial evidence that Weidman and Noll were high managerial agents of Far West acting within the scope of their authority under. *See* A.R.S. § 13–305(B) (officer or other agent "who is authorized to act on behalf of the corporation" and with authority regarding the "formulation of enterprise policy"). Weidman was President and Chief Operating Officer of Far West and a member of the board of directors. Noll was the supervisor for the sewage division of Far West, answered to Weidman and had considerable

authority over Far West's employees. He was in charge of Far West's safety program. He and Weidman together formulated and developed policies and practices of Far West regarding entry into underground sewage tanks. They made decisions and took actions regarding training, safety and equipment necessary for entry into such tanks. A jury could reasonably conclude that Weidman and Noll were high managerial agents of Far West and were acting within the scope of their authority.

### 6. Far West's Conduct

¶ 65 The State presented substantial evidence that Weidman and Noll engaged in acts and/or failed to act with the accompanying culpable mental states necessary to meet the statutory elements for each offense.

#### a. Awareness of Substantial Risk

¶ 66 The State presented substantial evidence that Weidman and Noll were aware of the extreme risks to employees working at Far West. Both were industry professionals with extensive training and experience in sewage treatment plants. They knew the dangers associated with confined spaces and sewer environments. They knew about potentially lethal dangers posed by toxic gases found in underground tanks. Weidman posited that the death and injuries occurred due to the toxic gases. Noll admitted that working in underground tanks was unsafe. A jury could reasonably conclude that Weidman and Noll were aware of the substantial and unjustifiable risk of death or physical injury involved in working in this environment.

#### b. Conscious Disregard of Risk

¶ 67 The State presented substantial evidence that Weidman and Noll knew and understood the OSHA permit-required confined space regulations and knew Far West was required to follow OSHA regulations. Such regulations required that Far West, among other things, adopt a written permit space program, develop procedures and practices for safe entry into confined spaces, provide adequate training to employees, obtain nec-

essary equipment for entry, testing and monitoring of permit spaces, establish a rescue plan, provide rescue equipment and emergency services and coordinate with third-party contractors.

¶ 68 Despite this knowledge, Weidman and Noll did not take steps to comply with OSHA. Instead, they devised a "clean-hole policy" in an apparent attempt to circumvent OSHA regulations. This policy, however, was never communicated to employees, never implemented and, in any event, could not have made the tanks safe for entry. Weidman and Noll knew Far West employees were entering permit-required confined spaces on a regular basis and knew they would enter the Tank on the day of the incident. A jury could reasonably conclude that Noll and Weidman consciously disregarded a substantial and unjustifiable risk of death or physical injury by knowingly violating OSHA regulations and permitting Far West employees to enter dangerous, life-threatening underground tanks without training, equipment, safety measures or rescue capability. A reasonable jury could find from this evidence that Weidman and Noll did more than "fail to perceive a substantial and unjustifiable" risk of death or serious physical injury for purposes of criminal negligence; they acted recklessly by being "aware of" and "consciously disregard[ing] a substantial and unjustifiable risk" of death or serious physical injury for purposes of aggravated assault and endangerment; and knowingly violated A.R.S. § 23–403 and OSHA regulations for purposes of A.R.S. § 23–418(E).

### c. Gross Deviation from Standards

¶ 69 The State presented substantial evidence that the conduct of Weidman and Noll constituted a gross deviation from the required standard of care and/or conduct. Several expert witnesses testified that the Tank was a permit-required confined space. Experts also testified that according to industry standards, once classified as a permit space, it is subject to mandatory OSHA regulations. They also testified that the "clean-hole policy" did not meet those requirements. Evidence supported the inference that Weid-

man and Noll simply ignored OSHA regulations. According to Weidman, the reason he did not implement a permit-required confined-space program was because he did not have the "time to create one." A jury could reasonably conclude that the conduct of Weidman and Noll constituted a gross deviation from the standard of care or conduct under a reasonable person standard for purposes of the Title 13 offenses.

¶ 70 Moreover, there was substantial evidence to show that Weidman and Noll engaged in conduct necessary to satisfy not only the elements of the criminal statutes defining the offenses but also the elements necessary to impose enterprise liability on Far West. *See* A.R.S. § 13–305(A)("failure to discharge a specific duty imposed by law" and/or conduct undertaken which constitutes offense and "is engaged in, authorized, solicited, commanded or recklessly tolerated" by directors or high managerial agents.) We therefore conclude the evidence was sufficient to permit a reasonable juror to find beyond a reasonable doubt that Far West, acting through its high managerial agents, caused the death of Gamble through criminally negligent conduct; that Far West caused serious physical injury to Garrett through reckless conduct; that Far West endangered Gamble and Garret with a substantial risk of imminent death and/or physical injury through reckless conduct, and that Far West, as an employer, knowingly violated the provisions of A.R.S. § 23–403 regarding the duty to maintain a safe workplace and/or any safety standard or regulation, causing Gamble's death.

### 7. Causation

¶ 71 Far West also argues there was insufficient evidence of causation. Under A.R.S. § 13–203(A) (2001), "Conduct is the cause of a result when both the following exist: (1) but for the conduct the result in question would not have occurred; and (2) the relationship between the conduct and result satisfies any additional causal requirements imposed by the statute defining the offense." Proximate cause is shown "by demonstrating a natural and continuous sequence of events stemming from the defen-

dant's act or omission, unbroken by any efficient intervening cause, that produces an injury, in whole or in part, and without which the injury would not have occurred." *Barrett v. Harris,* 207 Ariz. 374, 378, ¶ 11, 86 P.3d 954, 958 (App.2004). Proximate cause requires that the difference between the result intended by the defendant and the harm actually suffered by the victim " 'is not so extraordinary that it would be unfair to hold the defendant responsible for the result.' " *State v. Marty,* 166 Ariz. 233, 237, 801 P.2d 468, 473 (App.1990) (citation omitted) (defendant guilty of manslaughter by giving drugs and alcohol to sixteen-year old driver who subsequently died in an accident when the defendant made no effort to discourage victim from driving and it was foreseeable that a driver under the influence would be unable to drive safely). Thus, it is not necessary to show that a specific result or injury is foreseeable by the defendant in order to impose criminal liability.

¶ 72 There was ample evidence as set forth above that the incident leading to Gamble's death and Garrett's injuries directly resulted from the unsafe practices and policies regarding permit space entry adopted by Weidman and Noll on behalf of Far West. Dr. Verne Brown opined that the incident in which Gamble died and Garrett was injured was caused by "deficiencies" in those practices and policies. The conduct of Far West, both by its acts and omissions, set in motion a series of events that led to the incident and which were not so unforeseeable that it would be unfair to hold Far West criminally liable. The fact that neither Weidman nor Noll could foresee this precise result or injury is of no consequence. A jury could reasonably conclude that the conduct of Weidman and Noll as high managerial agents acting on behalf of Far West caused Gamble's death and Garrett's injuries.

¶ 73 Far West also argues that the act of Charles in turning on the lift station pumps was a superseding cause. To be a superseding cause, the intervening conduct must be unforeseeable and, with the benefit of hindsight, abnormal or extraordinary. *State v. Bass,* 198 Ariz. 571, 576, ¶ 13, 12 P.3d 796, 801 (2000). The evidence here shows that because of Far West's polices and procedures, Charles had little or no knowledge or training regarding operations in permit spaces or about the hazards of working in such spaces. She lacked basic information about safety procedures. Charles was not even informed that no one should enter an underground tank to pull the gravity line plug nor was she advised about the equipment necessary to enter such a tank. It was entirely foreseeable that Charles might commit an act such as turning on the pumps in a lift station and pump raw sewage into a tank without first ensuring either that no one was in the Tank or that no one would attempt to enter the Tank. This act was neither abnormal nor extraordinary and was not a superseding or intervening cause.

## C. Admission of Weidman's Statements

¶ 74 Weidman and several employees made statements to a state investigator during the criminal investigation in response to questions about Far West's safety practices and procedures and "the way [Weidman] managed the company in his capacity as president," some of which were incriminating to Far West. Far West filed a motion to preclude such statements unless those individuals testified at trial.

¶ 75 Although Weidman did not testify at trial, his statements were admitted through the investigator's testimony. The trial court denied Far West's motion to preclude Weidman's statements. It found, and we agree, that Weidman's statements, made in his capacity as president and chief operating officer of Far West, qualified as statements of Far West, that there was no adversity between Far West and Weidman, and that there was no Confrontation Clause violation.

¶ 76 On appeal, Far West again argues that admission of Weidman's statements violated the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 2, Section 24, of the Arizona Constitution because Far West did not have an opportunity to cross-examine

Weidman at trial.[10] *See Crawford v. Washington,* 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that Confrontation Clause precludes admission of testimonial out-of-court statements unless the witness is subject to cross-examination at trial or is unavailable and the defendant had a prior opportunity to cross-examine the witness). "We review evidentiary rulings for an abuse of discretion. Evidentiary rulings based on constitutional law or statutory construction, however, are reviewed de novo." *State v. Armstrong,* 218 Ariz. 451, 458, ¶ 20, 189 P.3d 378, 385 (2008) (internal citation omitted).

¶ 77 Because corporations can only act through their officers and agents, when corporate officers or agents act in their representative capacity and within the scope of their authority, such act is deemed to be an act of the corporation. *See Braswell v. United States,* 487 U.S. 99, 110, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988) (holding that "artificial entities such as corporations may only act through their agents"); *Miller v. Arnal Corp.,* 129 Ariz. 484, 491, 632 P.2d 987, 994 (1981) (holding that "a corporation is an impersonal entity which can only act through its officers and agents"). Accordingly, statements made by corporate officials in their representative capacity are statements of the corporation and are admissible against it. *See United States v. Bros. Constr. Co. of Ohio, Inc.,* 219 F.3d 300, 310–11 (4th Cir.2000)(holding that because a corporation can only act through its agents, the statement of a corporate officer is admissible against a corporate defendant); Ariz. R. Evid. 801(d)(2)(D) (statement by the "party's agent ... concerning a matter within the scope of the agency or employment, made during the existence of the relationship ...." not hearsay and admissible). Here, Weidman made statements to an investigator in his representative capacity as president of Far West and within the scope of his authority. Weidman's statements were the statements of Far West. Thus, subject to Confrontation Clause concerns, they were admissible against Far West.

¶ 78 Although the Confrontation Clause applies to statements made by a witness against a defendant, a defendant does not have the right to confront his own statements. *See United States v. Moran,* 759 F.2d 777, 786 (9th Cir.1985) (holding that defendant cannot claim Confrontation Clause violation if defendant's own out-of-court statements admitted at trial); *United States v. Southland Corp.,* 760 F.2d 1366, 1377 (2nd Cir.1985) (holding that statement made by corporate officer against corporation does not violate Confrontation Clause because "the witness it wishes to confront is, in the eyes of the law, itself."); *United States v. Rios Ruiz,* 579 F.2d 670, 676 (1st Cir.1978)(there is no Confrontation Clause problem when defendant's own out-of-court statements admitted at trial); *United States v. Lafferty,* 387 F.Supp.2d 500, 511 (W.D.Pa.2005)(stating in post-*Crawford* case that "inherent in Justice Scalia's analysis in the *Crawford* opinion was the idea that the right of confrontation exists as to accusations of third parties implicating a criminal defendant, not a criminal defendant implicating [him] self"). Under these principles, because Weidman's statements were statements of Far West, admission of his statements against Far West did not violate the Confrontation Clause. The court did not err in admitting Weidman's statements at trial.

### D. The Jury Instructions

¶ 79 Far West presents two issues regarding the jury instructions.

#### 1. Strict Liability

¶ 80 Far West first asserts the final jury instructions impermissibly created strict liability because they did not require the jury to find Far West had the requisite mental state for each offense. Specifically, Far West argues the jury instruction on an employer's duty to provide a safe workplace and the jury instruction on criminal liability of an enterprise "collide" to eliminate the required *mens rea* for each offense and create strict liability based simply on the failure to provide a safe workplace due to a violation of a

---

10. The Arizona Constitution provides "essentially the same right to confrontation" as the Sixth Amendment. *State v. Carr,* 216 Ariz. 444, 447, n. 2, ¶ 9, 167 P.3d 131, 134 n. 2 (App.2007).

safety standard or regulation. Whether jury instructions properly state the law is an issue we review de novo. *State v. Orendain,* 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997).

¶ 81 The purpose of jury instructions is to inform the jury of the applicable law. *State v. Noriega,* 187 Ariz. 282, 284, 928 P.2d 706, 708 (App.1996). Although the instructions need not be faultless, they must not mislead the jury and must provide an understanding of the issues. *See id.* It is only when the instructions, taken as a whole, are such that it is reasonable to suppose the jury would be misled that a case should be reversed for error in the instructions. *State v. Schrock,* 149 Ariz. 433, 440, 719 P.2d 1049, 1056 (1986). "Mere speculation that the jury was confused is insufficient to establish actual jury confusion." *State v. Gallegos,* 178 Ariz. 1, 11, 870 P.2d 1097, 1107 (1994). "Where the law is adequately covered by the instructions as a whole, no reversible error has occurred." *State v. Doerr,* 193 Ariz. 56, 65, ¶ 35, 969 P.2d 1168, 1177 (1998). Further, "In evaluating the jury instructions, we consider the instructions in context and in conjunction with the closing arguments of counsel." *State v. Johnson,* 205 Ariz. 413, 417, ¶ 11, 72 P.3d 343, 347 (App.2003).

¶ 82 The jury was instructed that "[a]n employer has a duty to provide a safe workplace for its employees. This duty includes furnishing each employee a place of employment that is free from recognized hazards that are causing or are likely to cause death or serious physical harm." The jury was instructed on enterprise liability in accordance with the statutory language of A.R.S. § 13–305(A)(1) and (2). "Conduct" was defined as "an act or omission and its accompanying culpable mental state." The jury was given definitions of "agent" and "high managerial agent," as well as definitions of each culpable mental state. The jury was instructed on the elements of each offense and explicitly instructed that the State must prove each element of each offense beyond a reasonable doubt.

¶ 83 The jury was further instructed that it could consider water treatment industry practices, the testimony of experts in the industry, and AOSHA safety standards as some evidence of whether defendant's conduct was reckless.[11] However, the trial court specifically instructed the jury that proof that Far West violated a safety standard or regulation does not, by itself, establish criminal liability for the charged offenses. Rather, the court instructed the jury that if it found Far West violated a safety standard or regulation, it was required to consider that evidence in conjunction with all other evidence to determine whether Far West's conduct was reckless.

¶ 84 Furthermore, during closing arguments, the State expressly argued that violations of safety standards or regulations alone cannot establish criminal liability, and that Far West's criminal liability must be established through proof of the culpable mental state of its high managerial agents. Defendant presented these same arguments in its closing argument.

¶ 85 We conclude that the jury was correctly instructed on the applicable law. The instructions set forth the applicable duty of an employer to provide a safe workplace, the basis for enterprise liability and the elements of each offense, including the requisite mental state. The jury was instructed that it was required to find each element of each offense beyond a reasonable doubt. The jury was also instructed that a violation of a safety standard or regulation does not, by itself, establish the requisite mental state. There is nothing in the instructions that would mislead the jury into believing it could find guilt based solely on a violation of a safety standard or regulation or the mere failure to provide a safe workplace. *See also Wendland v. AdobeAir,* 223 Ariz. 206, ¶¶ 27–28, 221 P.3d at 397 (limiting jury instruction informed jury that OSHA standards could be used as some evidence of standard of care in conjunction with all the evidence presented.) Finally, the closing arguments of both parties made it clear that criminal liability could

---

11. Contrary to Far West's contention, OSHA standards can be used as some evidence of what is "reasonable conduct under the circumstances" and whether a defendant met the standard of care. *See Wendland v. AdobeAir,* 223 Ariz. at 204, ¶¶ 20–21, 221 P.3d at 395.

not be based on strict liability, but must be established through proof beyond a reasonable doubt of each element of each offense. There was no error.[12]

### 2. Rejection of Proposed Jury Instructions

¶ 86 Far West next contends the trial court erred when it rejected Far West's proposed jury instructions. Far West argues the final instructions given to the jury permitted it to convict Far West based on the conduct of Charles, Gamble and/or Garrett rather than on the conduct of Far West's directors or high managerial agents. Because Far West did not raise this objection below, we review only for fundamental error. *Schrock*, 149 Ariz. at 440, 719 P.2d at 1056; Ariz. R.Crim. P. Rule 21.3(c).

¶ 87 The jury was correctly instructed regarding the duties of an employer and the theories under which a corporation could be convicted of a criminal offense. This included the requirement that a conviction based on conduct undertaken on behalf of the corporation and constituting the offense must be based on the conduct of a corporate director or a high managerial agent. The instructions further specified that Charles, the foreperson of the crew, was not a high managerial agent. There is nothing in the instructions that would mislead the jury into believing it could find Far West guilty of the charged offenses based on the acts or omissions of its lower level employees, rather than upon the conduct of its directors and/or high managerial agents. Further, during closing arguments, the parties stressed that Far West's criminal liability must be based on the conduct of Far West's high managerial agents. There was no error.

### E. Denial of Constitutional Right to a Fair Trial

¶ 88 Far West next asserts several grounds upon which to conclude that its constitutional right to a fair trial was denied. We reject its assertions.

### 1. Late Admission of Industry Standards

¶ 89 Far West first contends it was denied a fair trial because the trial court delayed ruling on its motion to introduce evidence of industry standards for entry of confined spaces until the thirteenth day of trial. Far West argues it was prejudiced because it therefore could not fully present this evidence throughout the trial and effectively cross-examine the State's witnesses and that it had to completely alter its defense strategy. "The trial court has considerable discretion in determining the relevance and admissibility of evidence, and we will not disturb its ruling absent a clear abuse of that discretion." *State v. Amaya–Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990).

¶ 90 To begin, Far West has forfeited its right to appellate review of this issue absent fundamental error because Far West raised it for the first time in a motion for new trial. *State v. Pandeli*, 215 Ariz. 514, 523, ¶ 7, 161 P.3d 557, 566 (2007). Before trial, while their cases were still joined, Far West and Weidman filed motions to introduce evidence of industry custom and practice in the Yuma community. The court denied Far West's motion. During oral argument on Weidman's motion, Weidman raised the broader question of admissibility of industry custom in general, an issue that Far West had not raised in its motion. Before the court had an opportunity to rule on the motion, the cases were severed.

---

12. Far West also argues the jury instructions were misleading because they failed to distinguish the general common law duty to provide a safe workplace from the specific statutory duty. Although the trial court initially ruled that the Defendant's liability was based solely on the common law duty to provide a safe workplace, after the close of evidence, the jury was instructed on both the common law duty and the statutory duty. Because nothing in the language of A.R.S. § 23–403(A) or AOSHA indicates the legislature intended to supersede or change the common law duty, we construe the common law and statutory duties as consistent with one another. *See Pleak v. Entrada Prop. Owners' Ass'n*, 207 Ariz. 418, 422, ¶ 12, 87 P.3d 831, 835 (2004); A.R.S. § 1–201 (2002). Although the language describing each duty varies as to its specificity, for all practical purposes, the common law duty and the statutory duty are substantively the same. Nothing in the instructions regarding Far West's duty to provide a safe workplace to its employees was erroneous or misleading.

¶91 Far West never objected to the court's failure to rule on Weidman's motion. Nonetheless, on its own, during trial, the court revisited the issue and ruled that Far West could present evidence of industry standards. Two expert witnesses testified on Far West's behalf. One witness testified that although Far West's interpretation of OSHA was incorrect, it was reasonable when compared to permit-required confined space entry programs of other companies. Another expert witness testified that other sewer plants engaged in practices and procedures for permit space entry similar to Far West's.

¶92 Even if the delayed ruling constituted error, Far West cannot show prejudice resulting from the court's alleged delayed ruling. *Pandeli,* 215 Ariz. at 521, ¶7, 161 P.3d at 566 (to show fundamental error, a defendant has to demonstrate that error occurred, that the error was fundamental and that the error caused prejudice). Far West was able to introduce evidence of industry standards to support its defense through expert witnesses. Far West vigorously cross-examined the State's witnesses regarding industry standards. Moreover, Far West never moved the court to recall any of the State's witnesses to conduct additional cross-examination. Also, Far West has not indicated which witnesses it would have cross-examined more fully and how the cross-examination might have changed the result. Finally, Far West has not indicated how it would have altered its defense strategy had the ruling been made before trial. The trial court's alleged delay in ruling was not fundamental, reversible error.

### 2. Admission of Evidence of ADOSH Investigation

■ ¶93 Far West next contends it was denied a fair trial when the trial court admitted evidence obtained during the investigation by ADOSH. Far West argues the evidence was inadmissible under A.R.S. § 23–408(E), which provides in relevant part that information and facts obtained in the course of an ADOSH investigation are, with some exceptions, "not admissible in any court. . . ." A.R.S. § 23–408(E)(2001).

¶94 The trial court ruled that the provisions of A.R.S. § 23–408(E) created an evidentiary privilege held by ADOSH, and that this privilege had been waived when ADOSH turned the case over to the Arizona Attorney General for criminal investigation. The trial court further ruled that, regardless of waiver, the evidence was admissible to prove Far West violated A.R.S. § 23–418(E) (violating a safety standard or regulation which caused the death of an employee).

■ ¶95 The issue of whether a privilege exists is a question of law which we review de novo. *State v. Sucharew,* 205 Ariz. 16, 21, ¶9, 66 P.3d 59, 64 (App.2003). Our supreme court has determined that A.R.S. § 23–408(E) creates an evidentiary privilege held only by ADOSH. *Indus. Comm'n v. Superior Court (Friend),* 122 Ariz. 374, 377, 595 P.2d 166, 169 (1979)(considering former A.R.S. § 23–408(D), now A.R.S. § 23–408(E)). When ADOSH referred this matter to the Attorney General for criminal investigation, as it was authorized to do, it voluntarily disclosed the subject information to the State and waived the privilege. The trial court did not err in admitting such evidence at trial.

### 3. Denial of Motion for Mistrial

■ ¶96 Far West next argues the trial court erred when it denied its motion for mistrial after the State elicited evidence at trial of Santec's guilty plea. This court reviews a trial court's denial of a motion for mistrial for an abuse of discretion, "bearing in mind that a mistrial is a 'most dramatic' remedy that 'should be granted only when it appears that this is the only remedy to ensure justice is done.'" *State v. Blackman,* 201 Ariz. 527, 538, ¶41, 38 P.3d 1192, 1203 (App.2002) (citation omitted).

¶97 At trial, the State called Santec's president, John Klingman, to testify. On cross-examination, Far West questioned Klingman on Santec's policies about entering permit spaces such as the Tank. Klingman testified that, in his opinion, a clean tank was not a permit-required confined space, that Santec employees had entered clean tanks without a permit and that no one ever told him this was wrong. Counsel for Far West

then asked Klingman, "Do you believe that any of your policies about going into clean holes was illegal?" Klingman responded, "No."

¶ 98 On redirect, Klingman reiterated that he did not believe Santec's practices were illegal, but acknowledged Santec was cited for various OSHA violations as a result of this incident. The State then asked, "And you said that you believed it was not illegal, what you were doing, but you've pled guilty in this case." Far West objected. After an unrecorded bench conference, the State was allowed to ask Klingman, "In this case, didn't Santec plead guilty to violating safety standards and causing the death of Mr. Lanser?" Klingman responded, "Yes."

¶ 99 Defendant moved for a mistrial. While the court took the matter under advisement, Far West was permitted to re-cross Klingman regarding Santec's reasons for entering a guilty plea. The court ultimately denied the motion for mistrial, finding that Far West opened the door to admission of this testimony. The court stated that "the clear import of these cross-examination questions was to exculpate Far West."

¶ 100 We see no error. Generally, a co-defendant's guilty plea is not admissible as substantive evidence of another defendant's guilt. *State v. Fendler*, 127 Ariz. 464, 484, 622 P.2d 23, 43 (App.1980). However, a co-defendant's guilty plea is admissible to impeach the credibility of a witness and prevent a defendant from misleading the jury. *Id. See also State v. Agnew*, 132 Ariz. 567, 573, 647 P.2d 1165, 1171 (App.1982) (evidence of co-defendant's guilty plea not admissible except where it attacks a witness's credibility and tends to impeach the witness's trial testimony).

¶ 101 Here, Far West opened the door to questions about Santec's guilty plea when it elicited testimony from Klingman that he was never told the "clean-hole policy" was wrong and that, in his view, there was nothing illegal about it. The State properly elicited testimony regarding Santec's guilty plea to impeach Klingman's credibility and to prevent the jury from being misled about the legality of such a policy. The trial court did not abuse its discretion in denying the motion for mistrial.

### 4. Excusing a Juror During Trial

¶ 102 As its last fair trial issue, Far West argues the trial court erred when it excused juror B. during trial. We review the dismissal of a juror for abuse of discretion. *State v. Roque*, 213 Ariz. 193, 220, ¶ 102, 141 P.3d 368, 395 (2006). In our consideration of the issue, we defer to the trial court's determination of the juror's demeanor and credibility. *Id.*

¶ 103 On the thirteenth day of trial, Charles informed court personnel that one of the jurors had contact with her in a restroom shortly after she testified. Charles later identified the juror as juror B. The court questioned juror B. who admitted she encountered Charles in the restroom and that Charles was crying. Juror B. said she hugged Charles, patted her on the shoulder and told her, "I'm sorry." Juror B. noted that both she and Charles were upset. Charles similarly informed the court that they both were crying.

¶ 104 The court found that hugging a witness, expressing sympathy to that witness and crying with that witness "is totally improper for the mindset of a juror to sit on this case or any other case." Over Far West's objection, the court found there was cause to remove juror B., designated her as an alternate and excused her from the panel. *See* Ariz. R.Crim. P. 18.4(b) ("when there is reasonable ground to believe that a juror cannot render a fair and impartial verdict, the court, on its own initiative ... shall excuse the juror from service.").

¶ 105 At the beginning and throughout the trial, the trial court admonished the jurors not to have contact with any parties, lawyers or witnesses until the case was over and not to let anyone discuss the case with them. Despite this, juror B. violated the court's admonition. A trial court may excuse a juror who blatantly violates the court's admonitions. *State v. Cook*, 170 Ariz. 40, 54, 821 P.2d 731, 745 (1991). There was no error.

## F. Civil Versus Criminal Liability

¶ 106 Although not raised as a separate issue, Far West contends its criminal prosecution "went beyond the statutory scheme for the liability of a corporation and imposed common civil law upon [it] to form the basis of criminal liability." It implies that its conduct at most gives rise to civil liability, but not criminal liability. We conclude, however, that its conduct went far beyond ordinary civil negligence or even gross negligence and crossed the line into criminal conduct.

¶ 107 The case of *In re William G.,* 192 Ariz. 208, 963 P.2d 287 (App.1998), is instructive on this point. There, a juvenile was riding a shopping cart in a busy parking lot and hit a parked vehicle. The juvenile was charged with criminal damage under A.R.S. § 13–1602, which requires proof that a person "recklessly defaces or damages property of another." On appeal, the juvenile asserted that the evidence was insufficient to prove the culpable mental state of criminal recklessness.

¶ 108 In an effort to "demarcate the border between criminal recklessness and civil negligence" and determine whether the legislature intended "to criminalize acts or omissions amounting to no more than civil negligence," this court considered the operative terms "consciously disregards a substantial and unjustifiable risk" and "gross deviation from the applicable standard of conduct." *Id.* at 212, 963 P.2d at 291. In analyzing the phrase "substantial and unjustifiable risk", we relied on *Williams v. Wise,* 106 Ariz. 335, 341, 476 P.2d 145, 151 (1970), which distinguished civil negligence from quasi-criminal gross negligence or reckless misconduct based on a difference in "degree of the risk" and concluded that the "difference of degree is so marked as to amount substantially to a difference in kind." *Id.* (citation omitted). We commented that " 'a very substantial deviation' [from the standard of care] is essential to criminal guilt," *id.* at 211, 963 P.2d at 291 (quoting Roll in M. Perkins, *Criminal Law,* ch. 7, § 2 at 666 (1957)), and that "defining a substantial risk as one 'different in kind' from the merely unreasonable risk

sufficient for civil negligence best serves the purpose of circumscribing reckless in such a manner that a fact-finder will not be misled into criminalizing conduct which is only civilly liable." *In re William G.,* 192 Ariz. at 214, 963 P.2d at 293. *See also Commonwealth v. Ruddock,* 25 Mass.App.Ct. 508, 520 N.E.2d 501, 504 (1988) (difference in degree between risk in civil negligence and risk in criminal context is "so marked" as to be a difference in kind.)

¶ 109 The *William G.* court also defined the phrase "gross deviation from the standard of conduct." Relying on the plain and ordinary meaning of the terms, the court determined it referred to conduct which was "flagrant and extreme," "outrageous, heinous [and] grievous." *Id.* at 214–15, 963 P.2d at 293–94 (quoting *Random House Unabridged Dictionary,* 842 (2d ed. 1993)). Based upon these definitions, the majority of the court concluded that no reasonable person could find that the juvenile's actions there rose to the level of criminal conduct. Although riding the shopping cart created an unreasonable risk of damage to parked cars, it did not create a substantial and unjustifiable risk of which the juvenile was aware and consciously disregarded. *Id.* at 214, 963 P.2d at 293. Also, while the juvenile's conduct was a deviation from the standard of care applicable to a civil negligence action, it was not extreme, outrageous, heinous or grievous so as to constitute a gross deviation from the relevant standard of conduct. *Id.* at 215, 963 P.2d at 294.

¶ 110 In contrast, here, a sewage treatment facility is an inherently dangerous workplace with obvious and recognized health hazards. A rational trier of fact could reasonably conclude that this environment creates an unusually high risk of harm, and that a substantial probability of death or serious physical injury would follow. Moreover, and just as necessary, a rational trier of fact could reasonably conclude that Far West's conduct in consciously disregarding such risks was flagrant and extreme and that it constituted a gross deviation from the relevant standard of care or conduct for pur-

poses of imposing criminal liability.[13] We therefore hold that the evidence was sufficient to support Far West's convictions beyond a reasonable doubt.

### G. Fines and Penalty Assessments

¶ 111 After a five-day mitigation hearing, the trial court suspended imposition of sentence and placed Far West on probation for a total of nine years. The court also imposed two fines of $500,000; one of which was for the offenses involving Gamble and the other for the offenses involving Garrett. The trial court considered each $500,000 fine to be the presumptive fine for each of the two groups of offenses.[14] With the addition of seventy-seven percent in statutory penalty assessments, this resulted in fines and penalties totaling $1,770,000. The fines and assessments were ordered to be paid at a rate of $17,425.00 per month during the term of probation. This amount was far less than what the State requested and substantially less than authorized by statute.

¶ 112 Far West contends the fines and penalty assessments imposed by the court are excessive and unreasonable. It argues that the fines and penalties were disproportionate, not necessarily to the offenses, but to its ability to pay. Far West also argues the trial court did not follow the guidelines for assessing fines, as set forth in A.R.S. § 13–803(F).

¶ 113 Both the Eighth Amendment of the Constitution of the United States and Article 2, Section 15 of the Arizona Constitution prohibit the imposition of excessive fines. *State v. Wise*, 164 Ariz. 574, 575, 795 P.2d 217, 218 (App.1990). "'An excessive fine is one that exceeds reasonable, usual, proper, or just punishment' or 'one so disproportionate to the offense that it shocks public sentiment and affronts the judgment of reasonable people.'" *State v. Russo*, 219 Ariz. 223, 227, ¶ 20, 196 P.3d 826, 830 (App.2008) (quoting *Wise*, 164 Ariz. at 576, 795 P.2d at

219). The ability to pay, however, is only one factor in the determination of whether a fine is excessive, and that factor is not dispositive. *Wise*, 164 Ariz. at 576, 795 P.2d at 219.

¶ 114 We conclude that the fines and penalty assessments imposed by the trial court are not excessive. The fines do not exceed "reasonable, usual, proper, or just punishment," nor are the fines so disproportionate to the offenses that they shock public sentiment or affront the judgment of reasonable people. Each presumptive fine is $500,000. The court could have imposed aggravated fines up to $1,000,000. A.R.S. § 13–803(A)(1) and (B) (2001). Given the serious nature of offenses committed by Far West, the presumptive fines are not excessive.

¶ 115 As to Far West's ability to pay, the trial court imposed the presumptive fines after considering substantial evidence regarding Far West's income and assets, its ability to pay a fine, the impact the fines could have on its business operations and the impact the fines could have on its ability to provide services to its customers. Based on its consideration of this evidence, the court determined that the imposition of presumptive fines and penalties would not cause Far West undue financial hardship. We agree. In short, the fines are neither unconstitutionally excessive nor "disproportionate" to Far West's ability to pay.

¶ 116 Regarding the alleged failure of the trial court to follow the factors contained in A.R.S. § 13–803(F), the record demonstrates otherwise. The court acknowledged it was required to consider the factors set forth in § 13–803(F) in its determination of the appropriate fine. The court then discussed every factor identified in § 13–803(F). For those factors the court found applicable to Far West, the court explained why it found those factors to be aggravating, mitigating or neither. After weighing the aggravating and mitigating factors, the court determined that presumptive fines were appropriate.

---

**13.** We do not suggest, however, that a breach of every common law, statutory or other duty is potentially criminal. Indeed the facts of this case present unique, unusual and extraordinary circumstances where the risk of harm was great and the conduct particularly egregious.

**14.** A fine is a criminal penalty and constitutes a sentence under Rule 26.1, Arizona Rules of Criminal Procedure. *State v. Pitts*, 26 Ariz.App. 390, 391, 548 P.2d 1202, 1203 (1976).

¶ 117 As long as it is within statutory limits, this court will not disturb the sentence unless the trial court abused its discretion by showing "arbitrariness or capriciousness or by failing to conduct an adequate investigation into the facts." *State v. Fatty,* 150 Ariz. 587, 592, 724 P.2d 1256, 1261 (App.1986). Further, a trial court is only required to consider the factors contained in A.R.S. § 13–803(F) in its determination of the appropriate fine. A.R.S. § 13–803(C). The court is not required to make any particular finding in regard to those factors. *See Fatty,* 150 Ariz. at 592, 724 P.2d at 1261 (a trial court is not required to find mitigating factors just because evidence is presented; it is only required to consider them). We conclude that the fines and penalty assessments imposed by the trial court are not excessive, and the trial court did not abuse its discretion in imposing the presumptive fines.

## CONCLUSION

¶ 118 For the foregoing reasons, we affirm Far West's convictions and sentences.

CONCURRING: DONN KESSLER, Presiding Judge, and LAWRENCE F. WINTRHOP, Judge.